No. 20-1984

# United States Court of Appeals
# for the First Circuit

---

**SANDRA COLMAN LERNER**
Plaintiff - Appellant

v.

**STEPHEN J. COLMAN, DANIEL J. FLYNN III, JAMES CANAVAN, LISA LaBRIQUE, ELIZABETH COLMAN, KAREN REIDY, KIRSTEN HUNT, and WILLIAM CHRISTOPHER COLMAN**
Defendants - Appellants

---

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (BOSTON)

---

## RECORD APPENDIX

---

MICHAEL F. CONNOLLY
COA #8323
WILLIAM D. BLACK
COA #1196411
RUBIN AND RUDMAN, LLP
53 State Street, 15th Floor
Boston, Massachusetts 02109
(617) 330-7101
mconnolly@rubinrudman.com
wblack@rubinrudman.com

*Counsel for Plaintiff - Appellant*

# RECORD APPENDIX
## TABLE OF CONTENTS

Docket Entries................................................................................................................1

Complaint......................................................................................................................8

Defendant Stephen J. Colman's Motion to Dismiss and Request for a Hearing ..................44

[Sibling] Defendants' Motion to Dismiss Plaintiff's Complaint and Joinder
in Defendant Stephen J. Colman's Motion to Dismiss [Doc# 25].......................................47

Defendant James Canavan's Motion to Dismiss ..................................................................52

Notice of Electronic Filing for Docket Number 45 ..............................................................54

Transcript of Motion to Dismiss Hearing Held Dec. 10, 2019.............................................56

Letter of Appellant's Counsel to District Court....................................................................67

District Court Memorandum and Order................................................................................68

District Court Order of Dismissal.......................................................................................118

Notice of Appeal................................................................................................................119

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: <u>1:19–cv–11738–WGY</u>

Lerner v. Colman et al

Assigned to: Judge William G. Young

 Case in other court:  USCA – First Circuit, 20–01984

Cause: 18:1964 Racketeering (RICO) Act

Date Filed: 08/12/2019

Date Terminated: 09/08/2020

Jury Demand: Plaintiff

Nature of Suit: 370 Other Fraud

Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**Sandra Colman Lerner**

represented by **Evan Georgopoulos**
Rubin & Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617–330–7000
*TERMINATED: 05/22/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael F. Connolly**
Rubin and Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617–330–7101
Email: <u>mconnolly@rubinrudman.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William D. Black**
Rubin and Rudman
53 State Street, 15th Flr.
Boston, MA 02109
617–330–7000
Email: <u>wblack@rubinrudman.com</u>
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Stephen J Colman**

represented by **Richard M. Gelb**
Gelb & Gelb, LLP
Suite 207 V
900 Cummings Center
Beverly, MA 01915
617–345–0010
Fax: 617–345–0009
Email: <u>rgelb@gelbgelb.com</u>

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet E. Taylor**
Gelb & Gelb, LLP
Suite 207 V
900 Cummings Center
Beverly, MA 01915
617–345–0010
Email: jtaylor@gelbgelb.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel J. Flynn, III**

**Defendant**

**James F Canavan**                    represented by    **Andrew C. Oatway**
Morisi & Oatway PC
730 Hancock Street
Quincy, MA 02170
617–479–0400
Fax: 617–479–6885
Email: aco@morisi.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lisa LaBrique**                    represented by    **Jill K. Hauff**
Looney Cohen & Aisenberg LLP
33 Broad Street
6th Floor
Boston, MA 02109
617.371.1050
Fax: 617.371.1051
Email: jhauff@lca–llp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Elizabeth Colman**                    represented by    **Jill K. Hauff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Karen Reidy**                    represented by    **Jill K. Hauff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kirsten Hunt**                    represented by  **Jill K. Hauff**
                                (See above for address)
                                *LEAD ATTORNEY*
                                *ATTORNEY TO BE NOTICED*


**Defendant**

**William Christopher Colman**      represented by  **Jill K. Hauff**
                                (See above for address)
                                *LEAD ATTORNEY*
                                *ATTORNEY TO BE NOTICED*


| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/12/2019 | 1 | | Filed in Error by Sandra Colman Lerner. (Connolly, Michael) Modified on 8/13/2019 (McKillop, Matthew). (Entered: 08/12/2019) |
| 08/12/2019 | 2 | | Civil Cover Sheet & Category Sheet by Sandra Colman Lerner. (Connolly, Michael) (Entered: 08/12/2019) |
| 08/12/2019 | 3 | 8 | COMPLAINT against Sandra Colman Lerner Filing fee: $ 400, receipt number 0101−7827690 (Fee Status: Filing Fee paid), filed by Sandra Colman Lerner. (Attachments: # 1 Category Form, # 2 Civil Cover Sheet)(Connolly, Michael) (Entered: 08/12/2019) |
| 08/13/2019 | 4 | | ELECTRONIC NOTICE of Case Assignment. Judge William G. Young assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Marianne B. Bowler. (Finn, Mary) (Entered: 08/13/2019) |
| 08/13/2019 | 5 | | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (McKillop, Matthew) (Entered: 08/13/2019) |
| 08/27/2019 | 6 | | SUMMONS Returned Executed James F Canavan served on 8/16/2019, answer due 9/6/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 7 | | SUMMONS Returned Executed William Christopher Colman served on 8/16/2019, answer due 9/6/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 8 | | SUMMONS Returned Executed Stephen J Colman served on 8/16/2019, answer due 9/6/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 9 | | SUMMONS Returned Executed Lisa LaBrique served on 8/17/2019, answer due 9/9/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 10 | | SUMMONS Returned Executed Elizabeth Colman served on 8/16/2019, answer due 9/6/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 11 | | SUMMONS Returned Executed Karen Reidy served on 8/16/2019, answer due 9/6/2019. (Connolly, Michael) (Entered: 08/27/2019) |

| 08/27/2019 | 12 | | SUMMONS Returned Executed Daniel J. Flynn, III served on 8/20/2019, answer due 9/10/2019. (Connolly, Michael) (Entered: 08/27/2019) |
|---|---|---|---|
| 08/27/2019 | 13 | | SUMMONS Returned Executed (Connolly, Michael) (Entered: 08/27/2019) |
| 08/27/2019 | 14 | | SUMMONS Returned Executed Kirsten Hunt served on 8/23/2019, answer due 9/13/2019. (Connolly, Michael) (Entered: 08/27/2019) |
| 09/05/2019 | 15 | | MOTION for Extension of Time to 09/13/2019 to Answer or Otherwise Plead by Stephen J Colman.(Gelb, Richard) (Modified on 9/9/2019 to Correct CM/ECF Filing Event) (Paine, Matthew). (Entered: 09/05/2019) |
| 09/06/2019 | 16 | | NOTICE of Appearance by Andrew C. Oatway on behalf of James F Canavan (Oatway, Andrew) (Entered: 09/06/2019) |
| 09/06/2019 | 17 | | Assented to MOTION for Extension of Time to October 7, 2019 to File Response as to 3 Complaint by James F Canavan.(Oatway, Andrew) (Modified on 9/6/2019 to Correct CM/ECF Filing Event) (Paine, Matthew). (Entered: 09/06/2019) |
| 09/06/2019 | 18 | | Assented to MOTION for Extension of Time to September 23, 2019 to Respond to Complaint by Elizabeth Colman, William Christopher Colman, Kirsten Hunt, Lisa LaBrique, Karen Reidy.(Hauff, Jill) (Modified on 9/6/2019 to Correct CM/ECF Filing Event) (Paine, Matthew). (Entered: 09/06/2019) |
| 09/06/2019 | 19 | | NOTICE of Appearance by Michael F. Connolly on behalf of Sandra Colman Lerner (Connolly, Michael) (Entered: 09/06/2019) |
| 09/06/2019 | 20 | | NOTICE of Appearance by Janet E. Taylor on behalf of Stephen J Colman (Taylor, Janet) (Entered: 09/06/2019) |
| 09/09/2019 | 21 | | Judge William G. Young: ELECTRONIC ORDER entered granting 15 MOTION for Extension of Time to 09/13/2019 to Answer or Otherwise Plead (Paine, Matthew) (Entered: 09/09/2019) |
| 09/09/2019 | 22 | | Judge William G. Young: ELECTRONIC ORDER entered granting 17 Assented to MOTION for Extension of Time to October 7, 2019 to File Response as to 3 Complaint. (Paine, Matthew) (Entered: 09/09/2019) |
| 09/09/2019 | 23 | | Judge William G. Young: ELECTRONIC ORDER entered granting 18 Assented to MOTION for Extension of Time to September 23, 2019 to Respond to Complaint. (Paine, Matthew) (Entered: 09/09/2019) |
| 09/09/2019 | 24 | | NOTICE of Appearance by Evan Georgopoulos on behalf of Sandra Colman Lerner (Georgopoulos, Evan) (Entered: 09/09/2019) |
| 09/13/2019 | 25 | 44 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing* by Stephen J Colman.(Taylor, Janet) (Entered: 09/13/2019) |
| 09/13/2019 | 26 | | MEMORANDUM in Support re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing* filed by Stephen J Colman. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4)(Taylor, Janet) (Entered: 09/13/2019) |
| 09/16/2019 | 27 | | NOTICE of Appearance by Richard M. Gelb on behalf of Stephen J Colman (Gelb, Richard) (Entered: 09/16/2019) |

| 09/17/2019 | 28 | | ELECTRONIC NOTICE Setting Hearing on Motion 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing* : Motion Hearing set for 11/7/2019 02:00 PM before Judge William G. Young. This hearing will be held at Boston College Law School, 885 Centre Street, East Wing, Room 115, Newton, MA. (Gaudet, Jennifer) (Entered: 09/17/2019) |
|---|---|---|---|
| 09/23/2019 | 29 | 47 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* by Elizabeth Colman, William Christopher Colman, Kirsten Hunt, Lisa LaBrique, Karen Reidy.(Hauff, Jill) (Entered: 09/23/2019) |
| 09/23/2019 | 30 | | MEMORANDUM in Support re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* filed by Elizabeth Colman, William Christopher Colman, Kirsten Hunt, Lisa LaBrique, Karen Reidy. (Hauff, Jill) (Entered: 09/23/2019) |
| 09/24/2019 | 31 | | ELECTRONIC NOTICE Setting Hearing on Motion 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* : Motion Hearing set for 11/7/2019 02:00 PM before Judge William G. Young. This hearing will be held at Boston College Law School, 885 Centre Street, East Wing, Room 115, Newton, MA. (Gaudet, Jennifer) (Entered: 09/24/2019) |
| 09/25/2019 | 32 | | Assented to MOTION for Extension of Time *to File Omnibus Opposition to Defendants' Two Motions to Dismiss* by Sandra Colman Lerner.(Connolly, Michael) (Modified on 10/1/2019 to Correct CM/ECF Filing Event) (Paine, Matthew). (Entered: 09/25/2019) |
| 09/30/2019 | 33 | | NOTICE of Appearance by William D. Black on behalf of Sandra Colman Lerner (Black, William) (Entered: 09/30/2019) |
| 09/30/2019 | 34 | | Second MOTION for Extension of Time *to File Omnibus Opposition to Defendants' Two Motions to Dismiss* by Sandra Colman Lerner.(Connolly, Michael) (Modified on 10/1/2019 to Correct CM/ECF Filing Event) (Paine, Matthew). (Entered: 09/30/2019) |
| 10/02/2019 | 35 | | Judge William G. Young: ELECTRONIC ORDER entered finding as moot 32 Assented to Motion for Extension of Time to File Response/Reply. (Gaudet, Jennifer) (Entered: 10/02/2019) |
| 10/02/2019 | 36 | | Judge William G. Young: ELECTRONIC ORDER entered granting 34 Second Assented to Motion for Extension of Time to File Response/Reply re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]*, 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing*. Responses due on or before 10/15/2019. (Gaudet, Jennifer) (Entered: 10/02/2019) |
| 10/04/2019 | 37 | | Assented to MOTION to Continue Motion to Dismiss Hearing to November 13, 2019 or November 14, 2019 by Stephen J Colman.(Taylor, Janet) (Entered: 10/04/2019) |
| 10/07/2019 | 38 | | Judge William G. Young: ELECTRONIC ORDER entered granting in part and denying in part 37 Assented to Motion to Continue. *The dates proposed in motion do not work for the Court's calendar. The next motion session is set for* |

| | | | |
|---|---|---|---|
| | | | *Tuesday, December 10, 2019 at 2:00 PM. This matter will be continued to this date/time.* (Gaudet, Jennifer) (Entered: 10/07/2019) |
| 10/07/2019 | 39 | | Set/Reset Deadlines as to 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]*, 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing*. Motion Hearing reset for 12/10/2019 02:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 10/07/2019) |
| 10/07/2019 | 40 | 52 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by James F Canavan.(Oatway, Andrew) (Entered: 10/07/2019) |
| 10/07/2019 | 41 | | MEMORANDUM in Support re 40 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by James F Canavan. (Oatway, Andrew) (Entered: 10/07/2019) |
| 10/08/2019 | 42 | | ELECTRONIC NOTICE Setting Hearing on Motion 40 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 12/10/2019 02:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 10/08/2019) |
| 10/15/2019 | 43 | | Opposition re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing*, 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* filed by Sandra Colman Lerner. (Attachments: # 1 Exhibit, # 2 Exhibit)(Connolly, Michael) (Entered: 10/15/2019) |
| 10/21/2019 | 44 | | Opposition re 40 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Sandra Colman Lerner. (Connolly, Michael) (Entered: 10/21/2019) |
| 12/10/2019 | 45 | 54 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 12/10/2019 re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Request for a Hearing* filed by Stephen J Colman, 40 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by James F Canavan, 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* filed by Elizabeth Colman, Lisa LaBrique, Kirsten Hunt, William Christopher Colman, Karen Reidy. After hearing arguments of counsel, the Court takes the matter under advisement and affords the plaintiff 30 days to plead in the alternative any federal securities claims in accordance with Rule 11. The defendants may within 14 days move to dismiss those claims. A further hearing will be set under separate notice. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Connolly and Black for the plaintiff, Attorneys Gelb, Hauff and Oatway for the defendants) (Gaudet, Jennifer) (Entered: 12/11/2019) |
| 12/19/2019 | 46 | 56 | Transcript of Motion to Dismiss Hearing held on December 10, 2019, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com Redaction Request due 1/9/2020. Redacted Transcript Deadline set for 1/21/2020. Release of Transcript Restriction set for |

| | | | |
|---|---|---|---|
| | | | 3/18/2020. (Scalfani, Deborah) (Entered: 12/19/2019) |
| 12/19/2019 | 47 | | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 12/19/2019) |
| 01/10/2020 | 48 | 67 | Letter/request (non–motion) from Michael F. Connolly, Esq. . (Connolly, Michael) (Entered: 01/10/2020) |
| 05/22/2020 | 49 | | NOTICE of Withdrawal of Appearance by Evan Georgopoulos (Georgopoulos, Evan) (Entered: 05/22/2020) |
| 09/04/2020 | 50 | 68 | Judge William G. Young: ORDER entered. MEMORANDUM AND ORDER The Defendants motions to dismiss as to counts I–III is GRANTED, and Lerners RICO claims are dismissed with prejudice. The Defendants motion to dismiss counts IV–VI is also GRANTED, and these claims are dismissed without prejudice. SO ORDERED.(Sonnenberg, Elizabeth) (Entered: 09/04/2020) |
| 09/08/2020 | 51 | 118 | Judge William G. Young: ORDER entered. ORDER DISMISSING CASE(Paine, Matthew) (Entered: 09/08/2020) |
| 10/07/2020 | 52 | 119 | NOTICE OF APPEAL as to 51 Order Dismissing Case, 50 Memorandum & ORDER, by Sandra Colman Lerner: $505.00 Filing Fee Paid: Receipt # 0101–8453639. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 10/27/2020. (Paine, Matthew) (Entered: 10/08/2020)** |
| 10/09/2020 | 53 | | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 52 Notice of Appeal. (Paine, Matthew) (Entered: 10/09/2020) |
| 10/09/2020 | 54 | | USCA Case Number 20–1984 for 52 Notice of Appeal filed by Sandra Colman Lerner. (Paine, Matthew) (Entered: 10/09/2020) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA COLMAN LERNER, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. |
| STEPHEN J. COLMAN, | |
| Defendant, | |
| v. | |
| DANIEL J. FLYNN III, and JAMES CANAVAN, | |
| Enterprise Defendants, | |
| v. | |
| LISA LaBRIQUE, ELIZABETH COLMAN, KAREN REIDY, KIRSTEN HUNT, and WILLIAM CHRISTOPHER COLMAN, | |
| Defendants. | |

## **COMPLAINT**

For almost twenty years, defendant Stephen J. Colman ("Colman" or "Defendant") was part of a criminal enterprise with Daniel J. Flynn, III ("Flynn") and James F. Canavan ("Canavan") (collectively the "Enterprise Defendants") that engaged in a series of fraudulent schemes under which they wrongfully diverted monies and assets from unsuspecting third parties in order to enrich themselves and others. These fraudulent schemes were perpetrated by Colman and Canavan, both of whom were and are members of the Massachusetts Bar and practicing attorneys, and Flynn, who operated a real estate and investment business as well as being a high-profile auctioneer in Massachusetts. In 2017, Flynn plead guilty to nine federal fraud charges

2255202_1

8

and is presently in prison serving a four-year sentence while Colman and Canavan continue to operate ostensibly as Massachusetts attorneys.

Plaintiff Sandra Colman Lerner ("Colman Lerner" or "Plaintiff") is a cousin of Colman and the latest victim to discover that the enterprise consisting of Colman, Canavan and Flynn conspired to and did in fact take control of over fifty percent of the shares of stock in Solar Resources, Inc. ("Solar Resources"), a Utah corporation that was founded, operated and owned by Colman Lerner and Colman's deceased uncle William J. Colman ("Bill Colman" or "Uncle Bill"). At or about the time of Bill Colman's death, Colman transferred over fifty-percent of the stock in Solar Resources to himself, his siblings, Bill Colman's then ex-wife, and Flynn and Canavan as members of the enterprise. Colman used his position as a Massachusetts attorney and nephew of Bill Colman to orchestrate this scheme and become the personal representative of Bill Colman's estate. As a result of defendants' wrongful conduct, Colman Lerner and the remaining heirs to Bill Colman's estate received a fraction of their inheritance. Colman intentionally concealed his actions from Colman Lerner, who did not discover the unscrupulous scheme until the summer of 2018.

Colman Lerner now brings this action seeking money damages for Colman and the Enterprise Defendants' violations of 18 U.S.C. § 1962(a),(b) and (c) ("Racketeering Influenced Corrupt Organizations Act" or "RICO") and against Colman for breaches of his fiduciary duties and fraud. The facts relating to the enterprise and the schemes perpetrated by Colman and the Enterprise Defendants are set forth below. Colman Lerner seeks to recover the monies and assets that Colman and the Enterprise Defendants wrongfully diverted from the estate of Bill Colman as well as treble damages and her attorneys' fees, costs and expenses incurred in this action pursuant to 18 U.S.C. § 1964(c).

2

## PARTIES

1.      Plaintiff Sandra Colman Lerner is an individual who resides in Quincy, Massachusetts.

2.      Defendant Stephen J. Colman is an individual who resides in Norwell, Massachusetts.  Colman is and has been an attorney licensed to practice law in Massachusetts since 1990.

3.      Enterprise Defendant Daniel J. Flynn III is an individual who is incarcerated in federal prison.  He is serving a four-year sentence, which will be followed by three years of supervised released.  Prior to his incarceration, Flynn resided in Milton, Massachusetts.

4.      Enterprise Defendant James F. Canavan is an individual who resides in Cohasset, Massachusetts.  Canavan is and has been an attorney licensed to practice law in Massachusetts since 1990.

5.      Defendant Lisa LaBrique is an individual who resides in North Andover, Massachusetts.

6.      Defendant Elizabeth Colman is an individual who resides in New Hampshire.

7.      Defendant Karen Reidy is an individual who resides in Chelmsford, Massachusetts.

8.      Defendant Kirsten Hunt is an individual who resides in Texas, and who maintains residence in Acton, Massachusetts.

9.      Defendant William Christopher Colman ("Chris Colman") is an individual who resides in Squantum, Massachusetts.

10.     Each of the non-enterprise defendants is a sibling of defendant Stephen Colman.

3

2255202_1

10

## JURISDICTION AND VENUE

11.     This is a RICO action conferring this Court subject matter jurisdiction pursuant to RICO's civil suit provision, 18 U.S.C. § 1964(c).  This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The amount in controversy is greater than $75,000.

12.     Venue in this District is proper because the events giving rise to this action occurred in Massachusetts, and the Plaintiff and Enterprise Defendants reside in Massachusetts.

## FACTS

### Bill Colman's Estate and Heirs at Law

13.     Bill Colman died without a will on December 11, 2011.  At the time of his death Bill Colman had no children and no spouse.

14.     Bill Colman had three siblings, all of whom pre-deceased him: Roy Colman, Robert Colman, and Marion Collins.

15.     Roy Colman and had six children: Defendant Stephen Colman, Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt and Chris Colman.

16.     Robert Colman had three children: Plaintiff Sandra Colman Lerner, Roberta Colman  (now deceased) and Robert Colman (now deceased).

17.      Marion Collins had three children: Thomas Collins, Mary Patricia Greene and Jack Collins.

18.     Bill Colman's twelve nieces and nephews are his heirs-at-law.

19.     Of all of Bill Colman's nieces and nephews, Colman Lerner was the closest to Uncle Bill.  Colman Lerner visited Bill Colman and his ex-wife Phyllis Colman (now deceased) on Martha's Vineyard every summer and spoke with him frequently on the phone.

20.     Stephen Colman and his siblings were not close to Bill Colman.  Although Stephen Colman did some legal work for Bill Colman, they did not have a close personal relationship.  Bill Colman told Colman Lerner that Chris Colman called him from time to time, but that he stopped taking his calls because he did not enjoy their conversations.

21.     During one of her visits with Uncle Bill and Phyllis Colman on Martha's Vineyard in the spring of 2010, Bill Colman asked Colman Lerner about Stephen Colman's law practice.  Colman Lerner informed Uncle Bill that she believed that Stephen Colman worked exclusively for Flynn.  Bill Colman did not know Flynn nor had he heard of him.  Bill Colman also told Colman Lerner that he had a "falling out" with Stephen Colman because he failed to do something he said he would do and that Stephen Colman was "no businessman."

22.     When Bill Colman discovered he was sick in early 2011, he moved to Martha's Vineyard.  Bill Colman spent the last eight months of his life on Martha's Vineyard.

23.     In June 2011, about six months before he died, Colman Lerner visited Bill Colman on Martha's Vineyard where they had a conversation about his health and the fact that he believed that he was broke.

24.     At that time, Bill Colman told Colman Lerner that he had very little money, telling her, for example, that he did not have enough money to purchase a used car and that he was on a waiting list for a subsidized assisted living facility.

25.     Prior to his death, Bill Colman was hospitalized on Martha's Vineyard and had a difficult time communicating.

26.     Bill Colman died on December 11, 2011 on Martha's Vineyard.

27.     Upon Bill Colman's death, Stephen Colman volunteered to be the personal representative of Bill Colman.

2255202_1

28.     In that role, Stephen Colman assumed sole and complete control of the estate.

29.     Stephen Colman was responsible for gathering and assuming control of Bill Colman's assets, settling his liabilities, and distributing the assets among the heirs.

30.     Bill Colman's estate consisted primarily of the business he founded in 2003, Solar Resources, Inc. ("Solar Resources").

31.     Colman Lerner and the other heirs were wholly dependent upon and trusted Stephen Colman for the management of Bill Colman's estate.  Stephen Colman was the only attorney among the heirs, a fact which he knew and of which he used to his advantage.

32.     In his capacity as personal representative of the estate, Stephen Colman owed a fiduciary duty to the estate and to each of Bill Colman's heirs, including Colman Lerner.

33.     By the laws of intestacy, each of Bill Colman's nieces and nephews received an equal share of Bill Colman's estate, amounting to approximately $362,000.00, primarily from the proceeds of the sale of Bill Colman's business, Solar Resources.

34.     As is set forth more fully below, Colman and the Enterprise Defendants orchestrated a fraudulent scheme which resulted in over 50% of the shares of stock in Solar Resources being transferred to Colman, his siblings, Bill Colman's ex-wife and Flynn and Canavan as the Enterprise Defendants.  This scheme was one of a number of fraudulent schemes carried out by an enterprise consisting of Colman, Flynn and Canavan.

### Nature of the Proceeding:  The Enterprise

35.     Colman, Canavan and Flynn have known each other since high school.

36.     Colman and Canavan were each admitted to the Massachusetts Bar in 1990 and have been members of the Bar since that time.

6

2255202_1

13

37.     Flynn is a graduate of Boston College and has been in the real estate and investment business at all relevant times.  Flynn has also been a high profile auctioneer for public charities and other organizations in Massachusetts.

38.     From approximately 1995 to sometime in 2014, Colman worked as general counsel for Flynn and his company Daniel J. Flynn & Co. ("DJFCO")

39.     At all relevant times, Flynn and DJFCO conducted business out of the property located at 1495 Hancock Street, Quincy, Massachusetts.

40.     From at least 2008 until approximately 2014, Colman's office was located at 1495 Hancock Street, Quincy, Massachusetts.

41.     Canavan's law office was also located at 1495 Hancock Street, Quincy, Massachusetts during the same approximate time period as Colman.

42.     Together, Colman, Flynn and Canavan operated a criminal enterprise (the "Enterprise") in which they participated in a series of fraudulent schemes to divert monies and assets from third parties in order to enrich themselves and others working with them.

43.     On September 23, 2015, Flynn was indicted in the United States District Court for the District of Massachusetts for wire fraud and mail fraud (the "Indictment") and the Government also sought asset forfeiture of the proceeds derived from such violations.

44.     On February 1, 2017, Flynn pleaded guilty to all nine charges in the Indictment, stemming from a series of fraudulent schemes commencing at least as early as 2007 and continuing until his Indictment in 2015.  As part of his guilty plea, Flynn agreed to provide restitution to 73 victims for a total amount over $20 million.  Flynn is currently serving a four-year sentence.

2255202_1

45.     The fraudulent schemes were conducted by Colman, Flynn and Canavan who collectively made up the Enterprise.

46.     Colman's role in the Enterprise was serving as Flynn's general counsel purporting to handle certain legal matters.

47.     Canavan's role in the Enterprise was also serving as a lawyer purporting to handle certain legal matters for the Enterprise.

48.     In reality, Flynn, Colman and Canavan conducted a series of transactions in which they collectively diverted and misappropriated monies and assets belonging to third parties.

49.     The particular fraudulent schemes conducted by Colman, Canavan and Flynn as the Enterprise include, but are not limited to (1) the DJF Real Estate Opportunity Fund scheme; (2) the Greenleaf Property scheme; (3) the East Howard Street Property scheme; (4) the Patriot Investments scheme; and (5) the Solar Resources scheme.

50.     Plaintiff Colman Lerner in this action seeks recovery for the Solar Resources scheme which directly caused her and others to suffer financial damages.  Certain of the other schemes are plead as predicate acts committed by Colman and the Enterprise Defendants.

### DJF Real Estate Opportunity Fund Scheme

51.     In November 2007, Flynn formed DJF Real Estate Opportunity Fund 1, L.P. (the "Fund") as a private investment fund with an individual, Alec Petro ("Petro"), who Flynn recruited to serve as a general partner to the Fund.  Petro and Flynn were to each contribute $1 million to the Fund.  The Fund's executive summary in its "Private Placement Memorandum" dated April 16, 2007, described the Fund as "a newly-formed private investment fund that will make opportunistic investment in commercial and residential real estate."  The executive summary further stated that the "Fund's primary focus is expected to be commercial and multi-

2255202_1

family residential real estate or loans secured by such real estate." The executive summary further described the "target investments" as "opportunistic or undervalued properties that can be acquired by the Fund with an equity investment of $500,000 to $5 million." The executive summary further stated that the Fund had been involved in 17 prior real estate investments totaling over $21 million that had generated an internal rate of return of over 203 percent.

52.     In January 2008, Flynn and Colman drafted and caused individual subscription agreements to be sent to 25 individuals who had agreed to be limited partners in the Fund in Massachusetts, New York, New Jersey, California, and elsewhere. The limited partners invested between $50,000 and $500,000. In the cover letter accompanying the subscription agreements dated January 14, 2008, Flynn represented that as of January 4, 2008, the Fund had over "8.5 million [dollars] in committed capital."

53.     Between April 2010 and continuing until April 2012, Flynn and Colman prepared periodic updates to the Fund's limited partners. The updates were signed by Flynn and Petro, although Petro had no role in drafting the updates. The updates purported to indicate what the Fund had paid for specific pieces of property and provided a fair market value. The updates were provided to the investors in the form of letters that were either mailed or emailed to the limited partners. The emails were routed over the internet through servers outside of Massachusetts.

54.     Flynn and Colman prepared an "Investment Summaries" schedule that was sent to the limited partners. The Investment Summaries listed seven different investment properties and nine outstanding promissory notes. The promissory notes, purportedly representing debts that were owed to the Fund, were listed as having a combined value of over $2.3 million. These

promissory notes were represented in the updates that were e-mailed to investors, including an update emailed on April 12, 2012.

55.     The nine promissory notes were fraudulent and did not represent legitimate debts owed to the Fund.

56.     Upon information and belief, Colman and/or Canavan drafted the false promissory notes and forged the signatures on the notes.

57.     Eventually, Flynn informed Petro that the promissory notes were false. Many of the limited partners filed suit against Flynn and DJFCO alleging a combined loss of more than $9 million.  On or about December 21, 2014, Petro committed suicide.

### The Greenleaf Property Scheme

58.     Colman, Flynn and Canavan engaged in a fraudulent scheme where they used the same property to entice different investors to loan or invest monies.  Under this scheme and others, Flynn served as the "front man" to seek financing and investors for alleged undervalued properties.  Colman, as in-house counsel to DJFCO and Flynn, drafted promissory notes, purchase and sale agreements and other legal documents, and Canavan conducted, among other things, residential real estate work and closings.

59.     In or about April 2005, Flynn purchased a building located at Greenleaf Street, Quincy Massachusetts (the "Greenleaf Property") for approximately $995,000.

60.     In July 2008, Colman and Flynn caused the Fund to purchase the Greenleaf Property from Flynn for approximately $2.2 million through an entity called "86 Greenleaf, LLC."  In a periodic update, Flynn listed the Greenleaf Property as one of the Fund's most significant assets.

61.     On September 14, 2010, Greenleaf, LLC sold Unit 203 of Greenleaf Place Condominium to Stephen Marcus, as trustee of the Quincy Center Realty Trust for $217,000. Canavan notarized the condominium unit deed.

62.     In or around February 2011, Flynn induced Geoffrey Caraboolad to loan the Fund $750,000 in two separate notes that Flynn said would be used to develop the Greenleaf Property, which was already owned by the Fund.  Colman drafted the loan documents. In the promissory notes drafted by Colman, the Fund promised to repay the loan plus interest, and Flynn represented to Caraboolad that he would record Caraboolad's mortgage on the property at the Registry of Deeds in Norfolk County.  The mortgage was not recorded at that time.

63.     On March 21, 2011, Flynn and Colman transferred title to the Greenleaf Property from Greenleaf, LLC to an entity they created called Greenleaf Condominium, LLC.  The same day, Flynn granted a mortgage for the Greenleaf Property in the amount of $1.15 million to an unrelated party named TDC Secured Strategies, LLC ("TDC").  After that transaction, Flynn recorded Caraboolad's mortgage.  Caraboolad was never repaid and filed suit against Flynn. Caraboolad's Complaint alleges that "Flynn's attorney" prepared the loan documents related to his promissory notes.

64.     On August 27, 2011, Greenleaf Condominium, LLC sold Unit 301 of Greenleaf Place Condominium to Yee Ting Wong for $238,000.  Colman notarized the condominium unit deed.

65.     In January 2012, Flynn convinced several other individuals to loan money ostensibly for the purchase of the Greenleaf Property, which the Fund already both owned, and had sold some of its units.  One of those individuals was Jay Derenzo ("Derenzo"), who loaned Flynn $100,000 in exchange for a promissory note and a guaranty, both of which were drafted by

11

Colman as "Flynn's attorney." Flynn failed to repay the note, and Derenzo filed a lawsuit against Flynn on September 14, 2012.

66.     In January 2012, Flynn induced three other individuals, Walter McDonough ("McDonough"), Kevin Carroll ("Carroll"), and Peter Higgins ("Higgins") to loan money ostensibly to purchase Greenleaf Property, which the Fund already owned. Based on Flynn's representations, McDonough, Carroll, and Higgins wired money to Flynn's account at Eastern Bank held in the name of Opportunity Holdings, LLC for the purchase of the Greenleaf Property. Upon information and belief, Colman and/or Canavan drafted promissory notes for each investor.

67.     The payments Flynn and Colman received from Caraboolad, Derenzo, McDonough, Caroll, Higgins, and other investors in the Greenleaf Property were not used to purchase the property, as the Fund already owned it, nor were they used to develop the property. Rather, Colman, Flynn, and Canavan used the money to repay earlier investors and fraud victims from their other schemes.

68.     McDonough questioned Flynn concerning his investment in the Greenleaf Property and Flynn provided McDonough with falsified purchase and sale agreements that purportedly related to the sale of two of the units of the Greenleaf Street Property. The buyer identified on the purchase and sale agreements, however, never intended to purchase any of the units at the Greenleaf Property. Upon information and belief, Colman drafted the falsified purchase and sale agreements.

69.     Upon learning that the Greenleaf Property was already owned by Flynn, some of the investors confronted Flynn about the true ownership of the property, and Flynn admitted that

12

he owned it. Certain of those investors filed suit against Flynn in Norfolk County Superior Court.

## East Howard Street Property Scheme

70.     On October 16, 2002, LINC Property I, LLC ("LINC"), a Delaware corporation registered to do business in Massachusetts, entered into a listing agreement (the "Agency Agreement") with Flynn, on behalf of DJFCO, engaging Flynn as LINC's exclusive agent to sell property situated on East Howard Street in Quincy, Massachusetts (the "East Howard Street Property").

71.     At this time, Colman was general counsel to DJFCO and Flynn, and prepared the legal and transaction documents.

72.     Pursuant to the Agency Agreement, Flynn and DJFCO agreed to advertise and make all reasonable efforts to sell the East Howard Street Property for $1,750,000.

73.     Acting in concert, Colman, Flynn, and Canavan embarked on a scheme to take control of the East Howard Street Property.

74.     On February 5, 2003, LINC entered into a purchase and sale agreement for the sale of the East Howard Street Property to the Des Moines Street Realty Trust, of which Canavan was the trustee and in which Flynn had an interest. The agreed purchase price of the property was $825,000.

75.     Flynn communicated to LINC only that the Des Moines Street Realty Trust was the nominee of a real estate developer named The Ansaldi Group, with whom Flynn had been negotiating for the sale of the property. Flynn failed to inform LINC of his own interest in the Des Moines Street Realty Trust.

2255202_1

76.     On April 1, 2003, the transaction closed and LINC was paid $825,000, less Flynn's brokerage commission of $41,250.

77.     In an attempt to squeeze even more money from the East Howard Street Property, Flynn also negotiated a sale of the property to George Brewster ("Brewster").

78.     In or around February 2003, before the transaction between the Des Moines Street Realty Trust and LINC closed, Flynn induced Brewster to invest in the East Howard Street Property.  Flynn told Brewster the sale price of the property was $1,325,000 million.  Brewster wired $1,325,000 to Canavan, in whose name the property was purchased.  Upon information and belief, Brewster did not know that Canavan was trustee to the Des Moines Street Realty Trust, which was then negotiating to purchase the property from LINC.

79.     LINC was also unaware of Flynn's negotiations with Brewster, in violation of the Agency Agreement.

80.     As a result, Brewster paid Canavan, Flynn, and DJFCO $1,325,000 for the East Howard Street Property, which Canavan as trustee purchased for only $825,000.

81.     Canavan later admitted to Brewster that the actual price of the East Howard Street Property was $825,000, and that Canavan had given the extra $500,000 to Flynn.

82.     Upon information and belief, Colman participated in the scheme to breach DJFCO's fiduciary and contractual duties under the Agency Agreement to LINC and defraud Brewster.

83.     Brewster later filed suit against DJFCO, Flynn, Canavan, and Colman for these and other fraudulent acts.

84.     On March 14, 2003, Frank Bellofatto, as trustee of the Bellofatto Family Realty Trust, sold 178-186 East Howard Street in Quincy to Canavan, as trustee of Pursuit Realty Trust.

2255202_1

85.     On April 7, 2004, Paul Talkowski, who, at the time, was President of DJFCO, replaced Canavan as trustee of Pursuit Realty Trust.  Colman notarized the Resignation of Trustee and Notice of Appointment of Successor Trustee.

86.     On June 9, 2005, Paul Talkowski as trustee of Pursuit Realty Trust, sold 178-186 East Howard Street in Quincy to James Ferrera Realty, Inc. for $605,000.00.  Colman notarized the Quitclaim Deed.

<strong>Patriot Investments Scheme</strong>

87.     In or about April 1999, Flynn approached Brewster in connection with an investment opportunity through a vehicle named "Patriot Acquisition."

88.     Flynn told Brewster that Patriot Acquisition was going to acquire investment properties in Billerica, Massachusetts.  Flynn asked Brewster to invest $1 million in the project.  He told Brewster that he was the manager of Patriot Acquisition and provided Brewster with a brochure identifying the purpose of the business and specifying that he and Brewster were parties to the business.

89.     Like the other schemes, Brewster's involvement was limited to financing and Flynn promised to find and develop the properties.

90.     Brewster gave Flynn two checks, each for $500,000.  Flynn deposited the first check on April 21, 1999, endorsing it as: "For Deposit Only, Patriot Acquisitions, Daniel J. Flynn, III."  Flynn deposited the second check on May 21, 1999, endorsing it as: "Daniel J. Flynn, Patriot Acquisitions."

91.     Brewster also gave Flynn a check for $450,000 to purchase a mortgage on a piece of property in Rhode Island as part of the Patriot Acquisition project.  On June 1, 2000, Flynn gave Brewster a promissory note in the amount of $450,000, with the maker of the note listed as

Patriot Investments, LLC, Daniel J. Flynn, III, Manager and Daniel J. Flynn, III, Individually.  In total, Brewster invested $1,600,000 in the Patriot Acquisition project.

92.     The entity Patriot Acquisitions never existed.

93.     Patriot Investments, LLC was formed on October 14, 1999.  Stephen Colman was the manager of Patriot Investments, LLC.

94.     Upon information and belief, Flynn gave Brewster's investment to Patriot Investments, LLC, which was controlled by Colman.

**Solar Resources Scheme**

95.     At the same time as the schemes described above, Colman and the Enterprise engaged in a separate but related scheme to take control of Bill Colman's company, Solar Resources, by secretly and without authorization, transferring stock in the company to themselves, and Stephen Colman's siblings and Bill Colman's former wife immediately prior to or after Bill Colman's death so that over half of the company did not pass through Bill Colman's estate to his heirs (the "Solar Resources Scheme").

96.     In or around 1984, and prior to incorporating Solar Resources, Bill Colman acquired ownership of Water Right 13-3457 in Utah (the "Water Right").  The Water Right was a valuable property interest which he held in his personal capacity.

97.     In or around October 2003, Bill Colman formed Solar Resources, a Utah company, to develop land in Utah for salt extraction.  He was the sole owner and shareholder of Solar Resources at that time.  He spent several years securing key land leases, applying for water rights, acquiring various items of equipment for use in Solar Resources' planned operations, and making improvements to the leased property.

98.     In 2005, Stephen Colman became Treasurer and Secretary of Solar Resources.

16

99.     Approximately two weeks before Bill Colman died in December 2011, the Water Right was transferred from Bill Colman personally to Solar Resources.

100.     Upon information and belief, Stephen Colman orchestrated the transfer of the Water Right from Bill Colman to Solar Resources without Bill Colman's authorization.

101.     On December 14, 2011, three days after Bill Colman died, Stephen Colman attempted to file an Assignment of Water Right, purportedly signed by Bill Colman on November 26, 2011, with the Utah Division of Water Rights.  Colman's filing was rejected because he failed to include all of the required paperwork.

102.     Upon information and belief, Stephen Colman forged Bill Colman's signature on the Assignment of Water Right.

103.     On January 4, 2012, Stephen Colman submitted the missing paperwork to the Utah Division of Water Rights, completing the transfer of the Water Right from Bill Colman to Solar Resources, the company which he now controlled, almost a month after Bill Colman died.

104.     Because the Water Right was owned by Solar Resources and not Bill Colman personally at the time the estate was probated, this valuable asset was not part of Bill Colman's estate and was not distributed among his heirs.

**Fraudulent Stock Transfers**

105.     As personal representative of Bill Colman's estate, Stephen Colman assumed control over all of Bill Colman's assets.

106.     As personal representative of Bill Colman's estate, Colman also became president of Solar Resources.

107.     Upon information and belief, shortly after Bill Colman died, Stephen Colman orchestrated transfers of 53.5% of the shares of Solar Resources to himself, the two Enterprise

17

Defendants – Daniel J. Flynn and James Canavan – and his siblings, and Bill Colman's ex-wife Phyllis Colman.

108.    Colman caused 7,500 shares of Solar Resources stock to be transferred to himself.

109.    Colman caused 2,500 shares of Solar Resources to be transferred to Flynn.

110.    Colman caused 1,750 shares of Solar Resources stock to be transferred to Canavan.

111.    Colman caused 2,500 shares of Solar Resources stock to be transferred to each of his siblings: Lisa LaBique, Elizabeth Colman, Kirsten Hunt, Karen Reidy and Chris Colman.

112.    Stephen also caused 2,500 shares of Solar Resources stock to be transferred to Phyllis Colman.

113.    Upon information and belief, Colman did not pay for, or did not pay a fair price for, the 7,500 shares of Solar Resources.

114.    Upon information and belief, Lisa LaBrique did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

115.    Upon information and belief, Elizabeth Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

116.    Upon information and belief, Kirsten Hunt did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

117.    Upon information and belief, Karen Reidy did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

118.    Upon information and belief, Chris Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources he received from Colman.

119.    Upon information and belief, Phyllis Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

120.    Upon information and belief, Flynn did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources he received from Colman.

121.    Upon information and belief, Canavan did not pay for, or did not pay a fair price for, the 1,750 shares of Solar Resources he received from Colman.

122.    Upon information and belief, Colman, Flynn, and Canavan knew or had reason to know that the stock they received in Solar Resources was not authorized by Bill Colman and was procured by fraud.

123.    Around the same time, Stephen Colman convened a meeting of Colman Lerner's siblings, Robert Colman and Roberta Colman, and their cousin, Tom Collins, but did not invite Colman Lerner to, nor inform her of, the meeting.  None of Colman's siblings were present at the meeting.

124.    At the meeting, Stephen Colman discussed the division of Bill Colman's estate, and told Robert Colman, Roberta Colman and Tom Collins that Stephen Colman's siblings had allegedly "invested" in Solar Resources, which was why they would be receiving a share of the profits from the planned sale of Solar Resources.

125.    Colman intentionally concealed the fact of the meeting and the concocted story that Colman's siblings had purportedly "invested" in Solar Resources from Colman Lerner who would have known that was false.  Had Colman Lerner heard that Stephen Colman's siblings had "invested" in Solar Resources, she would have known that was not true and made inquiry.

19

126.     Upon information and belief, Stephen Colman drew up falsified documentation of the stock transfers, including falsified check(s) for $5,000 from all or certain of his sibling(s) purporting to purchase 2,500 shares of Solar Resources stock.

127.     Upon information and belief, Stephen Colman back-dated the stock certificates and checks to February 2011, prior to Bill Colman's death.

128.     The fraudulent and unauthorized stock transfers allowed Stephen Colman to remove over half of the stock in Solar Resources from Bill Colman's estate shortly after Bill Colman died.

129.     When Colman Lerner questioned Stephen Colman about how Stephen Colman's siblings came to be stockholders in Solar Resources, Stephen Colman told Colman Lerner that Bill Colman had "gifted" the shares to his siblings.  Colman made this misrepresentation to Colman Lerner to conceal the fraudulent scheme.

**Sale of Solar Resources and Distributions to Colman, Flynn, Canavan and Others**

130.     In or about 2012, Stephen Colman orchestrated the sale of Solar Resources to Great Salt Lake Minerals Corporation ("GSLMC").  The sale closed in December, 2012. Colman structured the sale of Solar Resources as a stock sale, rather than an asset sale.

131.     Because Stephen Colman was the personal representative of the estate, and also a purported shareholder of Solar Resources individually, he had to disclose his interest in the company to each of the heirs and obtain their consent to the sale.

132.     Solar Resources sold for $11 million.

133.     Bill Colman's estate received approximately $5,115,000 from the sale of Solar Resources, which represented proceeds from the sale of 46.5% of stock in Solar Resources.

2255202_1

134.    The proceeds of the remaining 53.5% of stock in Solar Resources were distributed to Stephen Colman, his siblings, Phyllis Colman, Flynn, and Canavan.

135.    Colman received $2.5 million from the sale for his 7,500 shares of Solar Resources stock.

136.    Enterprise Defendant Flynn received $500,000 from the sale for his 2,500 shares of Solar Resources stock.

137.    Enterprise Defendant Canavan received $250,000 from the sale for his 1,750 shares of Solar Resources stock.

138.    Defendant Lisa LaBrique received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

139.    Defendant Elizabeth Colman received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

140.    Defendant Kirsten Hunt received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

141.    Defendant Karen Reidy received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

142.    Defendant Chris Colman received $500,000 from the sale for his 2,500 shares of Solar Resources stock.

143.    Phyllis Colman received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

144.    Upon information and belief, Colman, Flynn and Canavan knew or had reason to know that the amounts they received for the sale of Solar Resources were not rightfully theirs as the stock was procured by fraud.

21

145.    Moreover, the amounts of monies received for the purported sale of shares are not comesurate with the number of shares.  For example, Colman received $2.5 million for the purported sale of 7,500 shares of Solar Resources stock, yet Flynn and Colman's siblings each received $500,000 for the purported sale of 2,500 shares of Solar Resources stock.  Accordingly, Colman received an additional $1 million over the same price per share received by Flynn and Colman's siblings.

146.    When Colman Lerner ultimately learned of the sale of Solar Resources, she still did not know that Stephen Colman, his siblings, Phyllis Colman, Flynn, and Canavan together owned over half of the company and received a substantial payout from the sale.

147.    Colman Lerner first learned of the stock transactions in the summer of 2018 when her cousin, Tom Collins, who was also an heir of the estate, told Colman Lerner that he had been present at a meeting with Stephen Colman and Colman Lerner's siblings, Robert Colman and Roberta Colman, shortly after Bill Colman's death.  At the meeting, Stephen Colman said that his siblings had each "invested" in Solar Resources.  At that time, Colman Lerner realized that Stephen Colman's prior explanation, that his siblings had been "gifted" the stock, was false, and that Stephen Colman had orchestrated the sham stock transactions.

148.    Colman Lerner has been injured by the fraudulent stock transfers and sale of Solar Resources because had the fraudulent stock transfers not taken place, all of the shares of Solar Resources would have passed through the estate and Colman Lerner would have received a share of the proceeds of the sale of those shares.

149.    Colman Lerner was also injured by Colman's transfer of the Water Right because if the Water Right had not been transferred to Solar Resources, it would have passed through the estate and Colman Lerner would have received a share of its value.

2255202_1

150.     Instead, Colman and the Enterprise transferred Bill Colman's valuable Water Right to Solar Resources, then transferred the stock of over half of the company to themselves, Stephen Colman's siblings and Phyllis Colman, and, as a result, stole a substantial share of Colman Lerner's inheritance.

151.     Stephen Colman remains personal representative of the estate.

152.     Stephen Colman is also personal representative of the estate of Colman Lerner's sister, Roberta Colman, who passed away on June 21, 2018.

## COUNT I
**Violation of 18 U.S.C. § 1962 (c) Racketeer Influenced and Corrupt Organizations Act**

153.     Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-152.

154.     Defendant Stephen Colman is a culpable person for purposes of 18 U.S.C. § 1961(3).

155.     At all relevant times, the Enterprise, consisting of Colman, Flynn, and Canavan, was an association-in-fact enterprise within the meaning if 18 U.S.C. § 1961(4).

156.     As described herein, the Enterprise existed for the purposes of inducing investors to loan money to the enterprise under false pretenses and knowing the investors would not receive a return on their investments in order to obtain money not rightfully belonging to the enterprise and to illegally take control over Solar Resources, illegally increase the value of Solar Resources, and then sell it at a profit.

157.     The Enterprise formed in or around 1999 and continued at least until Flynn was indicted on September 23, 2015.

158.     18 U.S.C. § 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

23

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

159.   As described herein, committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 2314, and 18 U.S.C. §§ 471-473.

160.   The pattern of racketeering activity includes, but is not limited to, the following conduct:

a.   Colman, as Treasurer and Secretary of Solar Resources, caused 2,500 shares of stock in Solar Resources to be transferred to Flynn on or about January 7, 2008, or sometime thereafter, without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C.

§§ 471-473 (counterfeiting securities).

b.   Colman caused Solar Resources to issue a promissory note to Canavan for $50,000 on September 14, 2010, or sometime thereafter, without Bill Colman's authorization.

c.   On or about February 11, 2011, or sometime thereafter, Colman caused 7,500 shares of stock in Solar Resources to be transferred to himself without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).

d.   On or about February 11, 2011, or sometime thereafter, Colman caused 2,500 shares of stock in Solar Resources to be transferred to each of his siblings and Bill

24

Colman's ex-wife Phyllis Colman, without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).

e.  In December 2011, Colman falsified a Water Right Assignment form that purported to transfer Water Right 13-3457 from Bill Colman to Solar Resources, and dated the form November 26, 2011.

f.  On December 14, 2011, three days after Bill Colman died, Stephen Colman sent or caused to be sent, by mail the falsified Water Right Assignment to the Utah Division of Water Rights in violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

g.  On January 4, 2012, Colman drafted a Report of Water Right Conveyance and sent or caused it to be sent, by mail, to the Utah Division of Water Rights in violation of 18 U.S.C. §§ 1341 and 1343.

h.  In August 2012, Colman procured Colman Lerner's consent to the sale of Solar Resources without disclosing the facts that he had illegally transferred Water Right 13-3457 from Bill Colman's personal assets to Solar Resources, and illegally transferred almost half of the stock in Solar Resources to himself, Flynn, Canavan, his siblings, and Phyllis Colman.  Colman used the U.S. mail and wires to send the consent form to Colman Lerner in or about August, 2012, in violation of 18 U.S.C. §§ 1341 and 1343.

i.  In August 2012, Colman orchestrated the sale of Solar Resources' stock to Great Salt Lake Mineral Corporation and he, Flynn, Canavan, Colman's siblings, and Phyllis Colman received substantial payouts from the sale.

25

161.   Each violation enumerated above proximately damaged Colman Lerner.

## COUNT II
### Violation of 18 U.S.C. §§ 1962(a) and (b) Racketeer Influenced and Corrupt Organizations Act

162.   Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-161.

163.   Stephen Colman is a culpable person for purposes of 18 U.S.C. § 1961(3).

164.   At all relevant times, the Enterprise, consisting of Colman, Flynn, and Canavan, was an association-in-fact enterprise within the meaning if 18 U.S.C. 1961(4).

165.   As described herein, the Enterprise existed for the purposes of inducing investors to loan money to the enterprise under false pretenses and knowing the investors would not receive a return on their investments in order to obtain money not rightfully belonging to the Enterprise and to illegally take control over Solar Resources, illegally increase the value of Solar Resources, and then sell it at a profit.

166.   The Enterprise was formed in or around 1999 and continued at least until Flynn was indicted on September 23, 2015.

167.   18 U.S.C. § 1962(a) prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishing or operation of, any enterprise [engaged in interstate or foreign] commerce."

168.   As described herein, Stephen Colman derived income through participating in a pattern of racketeering activity, and used or invested that income in the operation of various enterprises – namely DJFCO and the various real estate entities established by the Enterprise.

2255202_1

169.   The pattern of racketeering activity through which Stephen Colman derived income includes, but is not limited to, the following:

    a.   Knowingly and purposefully using the United States mail and wire communications for the purpose of sending falsified promissory notes related to the DJF Real Estate Opportunity Fund 1, L.P. in violation of 18 U.S.C. §§ 1341 and 1343;

    b.   Knowingly and purposefully using the United States mail and wire communications on April 16, 2007 to transmit the Private Placement Memorandum for the DJF Real Estate Opportunity Fund 1, L.P. which falsely stated that the Fund had over $21 million in investments and generated a rate of return of over 203 percent in order to obtain investments;

    c.   Knowingly and purposefully using the United States mail and wire communications on January 14, 2008 to send individual subscription agreements to 25 individuals who had agreed to be limited partners in the Fund in Massachusetts, New York, New Jersey and California which falsely stated that the Fund had over "8.5 million [dollars] in committed capital."

    d.   Knowingly and purposefully using the United States mail and wire communications in January 2012 for the purpose of inducing investors to invest in the Greenleaf Property under false pretenses including but not limited to telling investors, including Jay Derenzo, Walter McDonough, Kevin Carroll and Peter Higgins that their investments would be used to purchase the Greenleaf Street Property when the defendants already owned or controlled the Greenleaf Street Property; and

27

    e.   Knowingly and purposefully using the United States mail and wire communications on April 12, 2012 to send a periodic update to the limited partners in the Fund that listed seven difference investment properties and nine outstanding promissory notes, purportedly representing debts that were owed to the Fund and listed as having a combined value of over \$2.3 million, all of which were fraudulent.

170.    18 U.S.C. § 1962(b) prohibits "any person through a pattern of racketeering activity, or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

171.    The defendants' racketeering activity includes, but is not limited to, the following actions:

    a.   Knowingly and purposefully using the United States mail and wire communications for the purpose of sending falsified promissory notes related to the DJF Real Estate Opportunity Fund 1, L.P. in violation of 18 U.S.C. §§ 1341 and 1343;

    b.   Knowingly and purposefully using the United States mail and wire communications for the purpose of inducing investors to invest in the Greenleaf Property under false pretenses including but not limited to telling investors that their investments would be used to purchase the Greenleaf Street Property when the defendants already owned or controlled the Greenleaf Street Property;

    c.   Using money and property fraudulently obtained to invest in other property and schemes of the criminal enterprise in violation of 18 U.S.C. § 1962(a);

2255202_1

d.  Transferring Water-Right 13-3457 to Solar Resources without Bill Colman's authorization;

e.  Transferring in interstate commerce stock in Solar Resources worth more than $5,000, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act);

f.  Receiving stock in Solar Resources worth more than $5,000, knowing such stock was procured by fraud; 18 U.S.C. § 2315 (the National Stolen Property Act);

g.  Obtaining stock in Solar Resources through a pattern of racketeering activity in violation of 18 U.S.C. c. 96, § 1962(b);

h.  Knowingly and purposefully using the United States mail and wire communications for the purpose of fraudulently obtaining plaintiff Colman Lerner Colman-Colman Lerner's consent to the sale of Solar Resources in violation of 18 U.S.C. §§ 1341 and 1343; and

i.  Participating in the affairs of Solar Resources through a pattern of racketeering activity in violation of 18 U.S.C. c. 96, § 1962(c).

172.  As set forth herein, each of the defendants participated in the conduct of the criminal Enterprise: Colman drafted fraudulent legal documents and caused them to be sent by email and mail to investors, Flynn induced investors to loan the enterprise money through fraud, misrepresentation, and deceit as to how the funds would be used and the strength of the investments, and Canavan contributed legal real estate work and purchased property that was central to the schemes to defraud.

2255202_1

173.    As set forth herein, the actions of the defendants have included the use of the mails and the internet in furtherance of their schemes to defraud, and constitute a pattern of actions which violate the provisions of 18 U.S.C. Chapter 96.

174.    As a result of the schemes to defraud, defendants received money and property by means of fraudulent pretenses.

175.    The defendants knowingly and willfully engaged in the schemes to defraud.

176.    As set forth above, the defendants have engaged in a pattern of racketeering activity including, but not limited to, mail and wire fraud, conversion, and the unlawful transfer and receipt of securities.

177.    The pattern of racketeering activity began no later than 1999.

178.    The predicate acts described herein are related and pose a threat of continued criminal activity as they have extended over a substantial period of time.

179.    Plaintiff has been damaged, and continues to be damaged, by the defendants' racketeering activities with respect to Solar Resources and the estate of William J. Colman.

180.    Unless abated, the defendants will likely continue their unlawful actions to transfer and conceal assets as evidenced by the activities set forth above.

**COUNT III**
**RICO Conspiracy 18 U.S.C. Section 1962(d)**

181.    Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-180.

182.    18 U.S.C. § 1962(d) provides that, "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

183.    Stephen Colman knowingly joined in a conspiracy with Flynn and Canavan to participate in the conduct of the Enterprise and agreed to commit racketeering activity with Flynn and Canavan.

184.    Stephen Colman did in fact participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity by agreeing to commit, or in fact committing, the predicate offenses alleged herein.

185.    As a result, Colman Lerner has been damaged.

## COUNT IV
## Breach of Fiduciary Duty

186.    Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-185.

187.    By virtue of his position as Personal Representative of the Estate of William Colman, Stephen Colman owed Colman Lerner a fiduciary duty.

188.    By virtue of his actions, including, *inter alia*, self-dealing, secretly transferring stock from Solar Resources to himself, his siblings, Phyllis Colman, Daniel Flynn, and James Canavan, removing assets from the estate of Bill Colman, and concealing material information from Colman Lerner that he had a duty to disclose, Stephen Colman breached his fiduciary duty to Colman Lerner intentionally and in bad faith.

189.    Stephen Colman's breach of his fiduciary duty has caused Colman Lerner to suffer harm.

2255202_1

## COUNT V
### Fraud

190.    Colman Lerner realleges and incorporates herein the allegations of the preceding paragraphs 1-189.

191.    Stephen Colman, Flynn, and Canavan orchestrated secret, fraudulent stock transfers that gave shares in Solar Resources to themselves, Stephen Colman's siblings, and Phyllis Colman for either de minimus consideration or no consideration.

192.    Stephen Colman misrepresented to Colman Lerner that Bill Colman owned only 46.5% of Solar Resources, which would pass through the estate.

193.    Stephen Colman misrepresented to Colman Lerner that his siblings had been "gifted" shares in Solar Resources.

194.    Colman Lerner's consent to the sale of Solar Resources was obtained based on material misrepresentations and omissions concerning the ownership of Solar Resources.

195.    Stephen Colman intentionally concealed his actions from Colman Lerner.

196.    Colman Lerner relied on Stephen Colman's omissions to her detriment by failing to object to the distribution of the proceeds of the sale of Solar Resources during the probate of the estate of Bill Colman.

197.    Colman Lerner could not and did not discover the harm to her interest in the estate due to Stephen Colman's fraudulent concealment of the stock transfers and ownership in the company.

198.    As a result of Stephen Colman's misrepresentations and omissions, Colman Lerner suffered harm.

32

## COUNT VI
### Money Had and Received
(Against Defendants Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt, and Christopher Colman)

199.    Colman Lerner realleges and incorporates herein the allegations of the preceding paragraphs 1-198.

200.    As alleged herein, Stephen Colman orchestrated the fraudulent transfer of stock in Solar Resources to each of the Money Had and Received Defendants.

201.    Each of the Money Had and Received Defendants either failed to pay for, or paid insufficient consideration for, the Solar Resources stock they received.

202.    The Money Had and Received Defendants' shares of Solar Resources stock should have passed through Bill Colman's estate to his heirs-at-law.

203.    Each of the Money Had and Received Defendants received $500,000 upon sale of Solar Resources to Great Salt Lake Mineral Company.

204.    Accordingly, the Money Had and Received Defendants have in their possession monies that were owed to the estate and, in turn, to Colman Lerner as an heir at law of the estate.

205.    Colman Lerner has no adequate remedy at law as against the Money Had and Received Defendants.

206.    Equity and good conscience dictates that the money received by the Money Had and Received Defendants be applied to the estate of Bill Colman and redistributed to his heirs at law.

WHEREFORE, Plaintiff requests that the Court:

A.    Enter judgment in Plaintiff's favor and against Defendant in the amount of actual damages sustained by Plaintiff as a direct and proximate result of Defendant's unlawful conduct;

2255202_1

B.     Enter an injunction against Defendant from further RICO violations and

divestment of any interests he has in any related entities;

C.     Order the Defendant to account for the property that he has unlawfully

appropriated;

D.     Award Plaintiff treble damages and attorneys' fees, costs and expenses pursuant

to 18 U.S.C. 1964(c);

E.     Award Plaintiff other relief that the Court deems just and proper.

## <u>JURY DEMAND</u>

**PLAINTIFF SANDRA COLMAN LERNER HEREBY DEMANDS A
TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
SANDRA COLMAN LERNER
By her attorneys,

Michael F. Connolly, BBO #551273
Evan Georgopoulos, BBO #628480
Rubin and Rudman LLP
53 State Street, 15th Floor
Boston, MA 02109
Tel: 617 330-7101
Fax: 617 330-7550
mconnolly@rubinrudman.com
egeorgopoulos@rubinrudman.com

Dated: August 12, 2019

34

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  Title of case (name of first party on each side only)   Sandra Colman Lerner v. Stephen J. Colman et al

    _____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

    [ ]  I.    160, 400, 410, 441, 535, 830*, 835*, 850, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

    [✔]  II.   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

    [ ]  III.  120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362,
              365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 560, 625,
              690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

              *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                            YES [ ]        NO [✔]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
    §2403)
                                                            YES [ ]        NO [✔]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                            YES [ ]        NO [✔]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                            YES [ ]        NO [✔]

7.  Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of
    Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).

                                                            YES [ ]        NO [✔]

    A.    If yes, in which division do all of the non-governmental parties reside?

          Eastern Division [ ]          Central Division [ ]              Western Division [ ]

    B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
          residing in Massachusetts reside?

          Eastern Division [✔]          Central Division [ ]              Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
    submit a separate sheet identifying the motions)

                                                            YES [ ]        NO [✔]

**(PLEASE TYPE OR PRINT)**
ATTORNEY'S NAME  Michael F. Connolly/Evan Georgopoulos
                 _____
ADDRESS  Rubin and Rudman LLP, 53 State Street, 15th Floor, Boston, MA 02109
         _____
TELEPHONE NO.  (617) 330-7101/(617) 330-7056
               _____

                                                            (CategoryForm1-2019.wpd )

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Sandra Colman Lerner

## DEFENDANTS

Stephen J. Colman, et al

**(b)** County of Residence of First Listed Plaintiff   Norfolk
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Norfolk
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael F. Connolly/Evan Geogopoulos, Rubin and Rudman LLP,
53 State Street, 15th Floor, Boston, MA 02109 (617) 330-7101

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
      Plaintiff

☒ 3   Federal Question
      *(U.S. Government Not a Party)*

☐ 2   U.S. Government
      Defendant

☐ 4   Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☒ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. section 1964(c)
Brief description of cause:
Defendant and Enterprise Defendants violations of RICO statute.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                    DOCKET NUMBER

DATE
08/12/2019

SIGNATURE OF ATTORNEY OF RECORD
*Michael F. Connolly*

FOR OFFICE USE ONLY

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA COLMAN LERNER<br><br>        Plaintiff,<br><br>v.<br><br><br>STEPHEN J. COLMAN,<br><br>        Defendant,<br>v.<br><br>DANIEL J. FLYNN, III and JAMES CANAVAN,<br><br>        Enterprise Defendants,<br>v.<br><br>LISA LaBRIQUE, ELIZABETH COLMAN, KAREN REIDY, KIRSTEN HUNT, and WILLIAM CHRISTOPHER COLMAN<br><br>        Defendants. | CIVIL ACTION NO. 1:19-cv-11738-WGY |

**DEFENDANT STEPHEN J. COLMAN'S MOTION TO DISMISS**
**<u>AND REQUEST FOR A HEARING</u>**

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), defendant Stephen J. Colman ("Colman") hereby moves that this Honorable Court enter an order dismissing  all claims against him brought by plaintiff Sandra Lerner Colman ("Lerner") in the Complaint in the above captioned action.  As grounds for his Motion to Dismiss, Colman states that Lerner has failed to: (1) state a claim against him upon which relief may be granted; and (2) plead fraud with particularity.  In support of his Motion to Dismiss, Colman  is filing concurrently herewith *Defendant Stephen Colman's Memorandum of Law in Support of His Motion to Dismiss*.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 7.1(d) of the Local Rules for the District of Massachusetts, Colman respectfully requests a hearing on his Motion to Dismiss.

Respectfully submitted

**DFENDANT STEPHEN J. COLMAN,**

By his attorneys,

*/s/ Janet E. Taylor*
Richard M. Gelb, Esquire (BBO# 188240)
Email: rgelb@gelbgelb.com
Daniel K. Gelb, Esquire (BBO# 659703)
Email: dgelb@gelbgelb.com
Janet E. Taylor, Esquire (BBO# 665646)
Email:  jtaylor@gelbgelb.com
**GELB & GELB LLP**
900 Cummings Center, Suite 207-V
Beverly, Massachusetts 01915
Telephone:  617-345-0010
September 13, 2019                 Facsimile:  617-345-0009

## LOCAL RULE 7.1 CERTIFICATION

I hereby certify that pursuant to Local Rule 7.1 for the District Court of Massachusetts, I met with counsel for plaintiff in an effort to narrow or resolve the issues.

/s/ *Janet E. Taylor*
Janet E. Taylor, Esquire

2

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 13, 2019.

                            */s/ Janet E. Taylor*
                            Janet E. Taylor, Esquire

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SANDRA COLMAN LERNER,                          )
                                               )
                    Plaintiff,                 )
v.                                             )
                                               )
STEPHEN J. COLMAN,                             )
                                               )
                    Defendant,                 )
v.                                             )        CIVIL ACTION NO:
                                               )        1:19-cv-11738-WGY
DANIEL J. FLYNN III, and JAMES                 )
CANAVAN,                                       )
                    Enterprise Defendants      )
v.                                             )
                                               )
LISA LaBRIQUE, ELIZABETH COLMAN,               )
KAREN REIDY, KIRSTEN HUNT, and                 )
WILLIAM CHRISTOPHER COLMAN,                    )
                                               )
                    Defendants.                )
                                               )

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**
**AND**
**JOINDER IN DEFENDANT STEPHEN J. COLMAN'S**
**MOTION TO DISMISS [DOC# 25]**

The Defendants, Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt, and William

Christopher Colman (collectively, the "Siblings"), pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6), hereby submit this Motion to Dismiss all claims and counts asserted

against them by Plaintiff, Sandra Colman Lerner ("Lerner") in her Complaint.  In addition, the

Siblings also hereby join in the Motion to Dismiss of Defendant Stephen J. Colman ("S.Colman")

(the "Motion") [Doc# 25] pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and

further request that this Court issue an order dismissing all of Plaintiffs' claims as to the Sibling Defendants.

In support hereof, the Siblings state as follows:

1.     As explained in S.Colman's Motion, the Court should dismiss the claims brought against him for violations of 18 U.S.C. §1962(a), (b) and (c) ("Racketeering Influenced Corrupt Organizations Act" or "RICO").  Specifically argued, Lerner fails to state a plausible RICO claim under the applicable standards of review.  First, her claims are a mere regurgitation of the federal statutes, rather than relevant facts and explanations of S.Colman's alleged "enterprise", "pattern or racketeering" or "conspiratory acts".  Second, none of her allegations are pled with the required particularity of "the circumstances constituting fraud or mistake" as mandated by Fed.R.Civ.P 9(b).  Accordingly, S.Colman's Motion to Dismiss the Plaintiff's RICO claims, as joined by the Siblings, should be allowed.[1]

2.     Upon dismissal of Plaintiff's RICO claims, the Court should relinquish jurisdiction of the remaining state common law claims against S.Colman and the Defendant Siblings.  As noted, there is no independently derived federal court jurisdiction under Fed.R.Civ.P. 12(b)(1) over Lerner's claims of Fraud (Count IV), Breach of Fiduciary Duty (Count V) or Money Had and Received (Count VI) and these claims must be dismissed for lack of subject matter jurisdiction.

3.     Specific to the Defendant Siblings, said Count VI, the lone count brought against the Siblings, is exclusively premised on the alleged fraud of S.Colman and, therefore, is subject to the heightened pleading standard of Fed.R.Civ.P. 9(b), which the Complaint wholly fails to

---

[1] In the interest of efficiency, the Siblings' Memorandum of Law in Support of their Motion to Dismiss, filed concurrently herewith, will not duplicate S.Colman's various arguments; rather, they will incorporate them by reference where relevant and raise any independent arguments when necessary.

attain.  As such, S.Colman's Motion to Dismiss the Plaintiff's state law claims, as joined by the Siblings, should be allowed.

4.      On their own, the Defendant Siblings hereby move to dismiss Count VI of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the basis that Plaintiff Lerner fails to state a claim upon which relief can be granted for money had and received.  Plaintiff claims that monies received by the Siblings from the sale of stock is allegedly owed to the estate of William J. Colman ("B.Colman") and, in turn, owed to Plaintiff as an heir at law of his estate.  Yet, Plaintiff has failed to plead any facts specific to the Siblings suggesting an independent theory of liability, separate from the conclusions and generalizations that S.Colman's alleged conduct caused her damage.  Accordingly, the Defendant Siblings Motion to Dismiss should be allowed.

**WHEREFORE,** for the foregoing reasons, the associated reasons set forth in Defendant S.Colman's Motion to Dismiss, and those contained in the Siblings' accompanying Memorandum of Law, the Defendant Siblings, respectfully request that Plaintiff's Complaint against each of them be DISMISSED with prejudice.

### **Request for Oral Argument**

Pursuant to L.R. D.Mass 7.1(d), Defendant Siblings respectfully requests oral argument be scheduled in conjunction with Defendant S.Colman's hearing to assist the Court in resolving the issues, jointly and independently, raised by this Motion.

Respectfully submitted,

**LISA LaBRIQUE, ELIZABETH COLMAN,**
**KAREN REIDY, KIRSTEN HUNT and**
**WILLIAM CHRISTOPHER COLMAN,**

By their Attorney,

Dated:  September 23, 2019          /s/  Jill K. Hauff_____
                                   Jill K. Hauff (BBO# 653886)
                                   LOONEY COHEN & AISENBERG LLP
                                   33 Broad Street, 6th Floor
                                   Boston, MA 02109
                                   Tel: (617) 371-1153 / Fax: (617) 342-4970
                                   jhauff@lca-llp.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA COLMAN LERNER, )<br><br>Plaintiff, )<br>v. )<br><br>STEPHEN J. COLMAN, )<br><br>Defendant, )<br>v. )<br><br>DANIEL J. FLYNN III, and JAMES )<br>CANAVAN, )<br>Enterprise Defendants )<br>v. )<br><br>LISA LaBRIQUE, ELIZABETH COLMAN, )<br>KAREN REIDY, KIRSTEN HUNT, and )<br>WILLIAM CHRISTOPHER COLMAN, )<br><br>Defendants. )<br>) | CIVIL ACTION NO:<br>1:19-cv-11738-WGY |

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 23, 2019.

*/s/ Jill K. Hauff*
Jill K. Hauff

### LOCAL RULE 7.1 CERTIFICATION

I hereby certify that, pursuant to Local Rule 7.1 of the District of Court of Massachusetts, I conferred with Plaintiff's counsel on September 17, 2019, and attempted in good faith to narrow or resolve the issues raised herein in advance of filing the Motion to Dismiss. The Plaintiff would not agree to withdraw her claims against the moving Defendants.

*/s/ Jill K. Hauff*
Jill K. Hauff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SANDRA COLMAN LERNER | * | |
| *Plaintiff* | * | |
| v. | * | CIVIL ACTION NO. 1:19-cv-11738-WGY |
| | * | |
| STEPHEN J. COLMAN | * | |
| *Defendant* | * | |
| | * | |
| v. | * | |
| | * | |
| DANIEL J. FLYNN, III and | * | |
| JAMES CANAVAN | * | |
| *Enterprise Defendants* | * | |
| | * | |
| v. | * | |
| | * | |
| LISA LABRIQUE, ELIZABETH | * | |
| COLMAN, KAREN REIDY, | * | |
| KIRSTEN HUNT and WILLIAM | * | |
| CHRISTOPHER COLEMAN, | * | |
| *Defendants* | * | |

## **DEFENDANT JAMES CANAVAN'S MOTION TO DISMISS**

Defendant, James Canavan ("Canavan"), through counsel, respectfully moves this Honorable Court, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all of the counts in the plaintiffs *Complaint* that are alleged against him, i.e., Counts I-V.

In support of this motion, Canavan respectfully submits a *Memorandum of Reasons In Support of James Canavan's Motion to Dismiss*.

### **Request for Oral Argument**

Pursuant to Rule 7.1(d) of the Local Rules for the District of Massachusetts, Canavan requests a hearing on this motion.

1

JAMES CANAVAN

*By his attorneys,*

MORISI & OATWAY, P.C.

DATED:  October 7, 2019          /s/ Andrew C. Oatway
                                 Andrew C. Oatway BBO# 561885
                                 aco@morisi.com
                                 MORISI & OATWAY, P.C.
                                 730 Hancock Street
                                 Quincy, MA  02170-2723
                                 Voice   617.479.0400
                                 Fax     617.479.6885

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

    I, Andrew C. Oatway, hereby certify that I conferred with counsel and made a good faith attempt to resolve or narrow areas of dispute prior to filing this motion.

*/s/ Andrew C. Oatway, Esq.*

Andrew C. Oatway

**CERTIFICATE OF SERVICE**

    I, Andrew C. Oatway, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 7, 2019.

*/s/ Andrew C. Oatway, Esq.*

Andrew C. Oatway

```
MIME-Version:1.0
From:ECFnotice@mad.uscourts.gov
To:CourtCopy@localhost.localdomain
Message-Id:8569512@mad.uscourts.gov
Subject:Activity in Case 1:19-cv-11738-WGY Lerner v. Colman et al Motion Hearing
Content-Type: text/html
```

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**


The following transaction was entered on 12/11/2019 at 10:42 AM EST and filed on 12/10/2019

| | |
|---|---|
| **Case Name:** | Lerner v. Colman et al |
| **Case Number:** | 1:19–cv–11738–WGY |
| **Filer:** | |
| **Document Number:** | 45(No document attached) |

**Docket Text:**
 **Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 12/10/2019 re [25] MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** *And Request for a Hearing* **filed by Stephen J Colman, [40] MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by James F Canavan, [29] MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** *and Joinder in Defendant Stephen J. Colman's Motion to Dismiss [Doc #25]* **filed by Elizabeth Colman, Lisa LaBrique, Kirsten Hunt, William Christopher Colman, Karen Reidy. After hearing arguments of counsel, the Court takes the matter under advisement and affords the plaintiff 30 days to plead in the alternative any federal securities claims in accordance with Rule 11. The defendants may within 14 days move to dismiss those claims. A further hearing will be set under separate notice. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Connolly and Black for the plaintiff, Attorneys Gelb, Hauff and Oatway for the defendants) (Gaudet, Jennifer)**


**1:19–cv–11738–WGY Notice has been electronically mailed to:**

Richard M. Gelb     rgelb@gelbgelb.com, jtaylor@gelbgelb.com

Michael F. Connolly     mconnolly@rubinrudman.com, Lyankowski@rubinrudman.com

Andrew C. Oatway     aco@morisi.com, ced@morisi.com

Evan Georgopoulos     egeorgopoulos@rubinrudman.com, lmaxwell@rubinrudman.com

Jill K. Hauff     jhauff@lca–llp.com, tchace@lca–llp.com

Janet E. Taylor     jtaylor@gelbgelb.com

William D. Black     wblack@rubinrudman.com

**1:19–cv–11738–WGY Notice will not be electronically mailed to:**

```
 1                   UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3                             No. 1:19-cv-11738-WGY

 4

 5    SANDRA COLMAN LERNER,
                 Plaintiff
 6

 7    vs.

 8

 9    STEPHEN J. COLMAN, et al,
                 Defendants
10

11                          *********

12

13                     For Hearing Before:
                       Judge William G. Young
14

15                      Motion to Dismiss

16

17                     United States District Court
                       District of Massachusetts (Boston)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Tuesday, December 10, 2019
19

20                          ********

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                 United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                   bulldog@richromanow.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   MICHAEL F. CONNOLLY, ESQ.
     WILLIAM D. BLACK, ESQ.
 4       Rubin and Rudman, LLP
         53 State Street, 15th Floor
 5       Boston, MA 02109
         (617) 330-7101
 6       Email: Mconnolly@rubinrudman.com.
         For plaintiff
 7

 8   RICHARD M. GELB, ESQ.
         Gelb & Gelb, LLP
 9       900 Cummings Center, Suite 207V
         Beverly MA 01915
10       (617) 345-0010
         For defendant Stephen J. Colman
11

12   ANDREW C. OATWAY, ESQ.
         Morisi & Oatway, P.C.
13       730 Hancock Street
         Quincy, MA 02170
14       (617) 479-0400
         Email: Aco@morisi.com
15       For defendant James F. Canavan

16

17    JILL K. HAUFF, ESQ.
         Looney Cohen & Aisenberg, LLP
18       33 Broad Street, 6th Floor
         Boston, MA 02109
19       Email: Jhauff@lca-llp.com
         For Defendants Lisa LaBrique, Elizabeth Colman,
20       Karen Reidy, Kirsten Hunt, and William C. Colman

21

22

23

24

25
```

```
1          P R O C E E D I N G S
2          (Begins, 2:30 p.m.)
3          THE CLERK:  Now hearing Civil Matter 19-11738,
4     Lerner versus Colman, et al.
5          THE COURT:  And would counsel identify themselves.
6          MR. CONNOLLY:  Good afternoon, your Honor, Michael
7     F. Connolly, from Rudman and Rubin, representing Sandra
8     Lerner Colman.
9          MR. BLACK:  Will Black representing Sandra Lerner
10    Colman.
11         MR. GELB:  Richard Gelb representing Defendant
12    Stephen J. Colman.
13         MS. HAUFF:  Jill Hauff representing the defendants
14    Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten
15    Hunt, and William Christopher Colman.
16         MR. OATWAY:  Good afternoon, your Honor, Andrew
17    Oatway, and I represent defendant James Canavan.
18         THE COURT:  All right.  Please be seated.
19         I say this to help, believe me, and in one sense
20    this is most interesting case we have on this afternoon
21    and it's the most interesting for this reason.  In the
22    Court's eyes it's interesting because of this exception
23    to RICO, which is found in the PLSRA.  The second
24    opinion I wrote as a United States District Judge had to
25    do with RICO, and I'm so old that RICO had just come
```

1    into being and we were exploring the contours of it.

2    Now we not only know the contours of it, it's been

3    layers of other actions and now it has exceptions, or

4    it's got one significant exception, and I will tell you,

5    this securities law exception, gives me great pause in

6    this case.  Because if the securities law exception

7    applies, then the RICO counts fall out, there's nothing

8    left, because I don't have diversity jurisdiction, and

9    you're back in the state courts.  On the other hand, if

10   the securities exception does not apply, my reaction to

11   all of this is these are well-pleaded RICO claims.  RICO

12   is difficult to prove, but I shouldn't be huffing and

13   puffing about that, we'll have a trial on it or we'll

14   deal with it on summary judgment.  But the exception

15   turns everything on its head, as the First Circuit has

16   recognized.

17        Now I've got to think on these facts do they fall

18   within the framework of a securities law claim and

19   taking all intendments toward that proposition, if they

20   do, plaintiffs lose.  On the other hand, if they don't,

21   there's no exception and we've got a racketeering case

22   with some attendant state causes of action and the case

23   goes forward.

24        And so I have this perhaps, um -- I don't want to

25   delay it, but this is one that I'll listen to you and

1   then probably take it under advisement, because on this

2   exception, I've never heard of this before, and it's

3   fascinating, and you briefed it well.

4        I wonder if you don't want to plead in the

5   alternative your securities law claim against these same

6   defendants.  Now there may be different statutes, there

7   may be the statute of limitations, there may be

8   different defendants, or there's a real question whether

9   Ms. Lerner has standing, and then we'll have another

10  round where they attack that.  And then I have

11  everything sharp, because if they're right and the

12  statute -- they're between a rock and a hard place,

13  because if they're right and the securities law falls

14  out, racketeering goes forward.  If they're wrong -- if

15  they -- if the pleading of the securities law claim in

16  fact is correct, they're going to have to face that

17  securities law claim, but they win on racketeering, um,

18  because of the exception, and I can go forward with the

19  securities law claim and attendant state causes of

20  action.

21       What do you think about -- since that's the claim,

22  what do you think about doing it that way, giving you 30

23  days to do that and coming back?

24       MR. CONNOLLY:  Well, your Honor, I would certainly

25  take the 30 days to think about it, and I have thought a

1   lot about that securities law issue in this complaint,

2   and our position in our papers, and I'm not going to go

3   over it ad nauseam, but we don't believe that Ms. Lerner

4   Colman would be able to bring a securities law claim --

5         THE COURT:  Oh, I understand.  I understand.  And

6   you may be right.  You can say "I don't want to try

7   that."  And that doesn't relieve me of my duty to decide

8   a well-pleaded motion before me, and I'll decide it up

9   or down and we'll see where we are.  To lose, you're out

10   of court here, and of course the statute -- well I don't

11   know if it's wrong or not, but you'll have to bring

12   another action or bring an action under the counterpart

13   state causes of action.  You win, you've got your

14   racketeering claims here and we'll test them by summary

15   judgment and trial.

16         MR. CONNOLLY:  Sure, your Honor.  So I will take a

17   look at it, if you would like, and, um, supplement with

18   a memorandum on the securities law --

19         THE COURT:  I don't want a supplemental

20   memorandum, I want to put them between a rock and a hard

21   place, I want an alternative pleading.

22         MR. CONNOLLY:  Okay.

23         THE COURT:  But I'm not -- I can't order it, and

24   I'm not ordering it.  I'm just trying to get my arms

25   around an interesting issue in for me a persuasive way.

```
 1    If you don't want to do it, that's fine.
 2         MR. CONNOLLY:  Your Honor, I take your lead, um,
 3    and I understand where you're going, and I'm happy to
 4    plead it in the alternative and come back to you on an
 5    amended complaint.
 6         THE COURT:  Now what do you think about that?  We
 7    don't get to the merits, but, um -- although I have
 8    opined on my initial reaction here.
 9         Mr. Gelb?
10         MR. GELB:  I don't know if that works, your Honor,
11    for the following reason.
12         THE COURT:  Why?
13         MR. GELB:  Clearly the predicate acts other than
14    Solar are securities transactions, so that's without
15    question.  The Solar transactions involve two things,
16    one is transfers of shares to -- not to the plaintiff,
17    but to other parties that they want to call back, and
18    these water rights.  Those are unrelated in the pattern
19    to these other schemes.
20         THE COURT:  No, no, you see I understand that.
21    Well I don't understand it as well as you do and I say
22    this with respect.  But either way something will
23    survive.  You may be right, by standing up and saying,
24    "Clearly these are security actions, let's bring them
25    before the Court, those are federal claims," and maybe
```

1    they can't go against all the defendants, maybe a

2    variety of things.  But if those are the claims that are

3    viable, well then racketeering falls out, those are the

4    claims, and I have a different lawsuit.  But either one

5    I can handle aided by skilled counsel.

6        MR. GELB:  I think what the problem is, your

7    Honor, is that in order to fall within the PSLRA, it has

8    to be a purchase or sale of securities.  So the

9    plaintiff has to either be a purchaser or a seller.

10   Here you don't have that.  What you have is you have a

11   Utah probate proceeding where the assets of Bill Colman

12   were probated.  The -- so the plaintiff only has a

13   proportion of anything.

14       THE COURT:  But aren't you talking yourself into a

15   racketeering claim?

16       MR. GELB:  No, because I think they're security

17   transactions.

18       THE COURT:  Well you said that would mean that

19   it's a purchase and sale experience, and she didn't.

20       MR. GELB:  I don't think she comes under that.  I

21   don't think it's a racketeering activity because it's

22   not part of the same scheme.

23       THE COURT:  Oh, that's a different claim.  You're

24   attacking the pattern.  I follow that.  And maybe we

25   should have argument on that.  I follow that.

1            MR. GELB:  I guess the point I'm making is, and I

2    think you follow it, but you have an exception of the

3    PSLRA.

4            THE COURT:  All right.

5            MR. GELB:  That's the predicate acts.  You have

6    the claim of the plaintiff.  The plaintiff has to be

7    able to show, in a RICO case, that what was done through

8    the probate court inventory, which she gave the stay for

9    the activities, are related to the purchase and sale of

10   promissory notes, which are securities.

11           THE COURT:  All right.

12           MR. GELB:  So that's -- so I don't think she has

13   either a RICO claim or a securities claim.

14           THE COURT:  I hear you and I understand that and I

15   would have to reflect on it.  Thank you.

16           How about the other defendants, what do you say?

17           MR. OATWAY:  I don't have anything to add to what

18   Attorney Gelb said with regard to that specific

19   question, your Honor.

20           THE COURT:  Okay.

21           MR. OATWAY:  I have other things to say of course,

22   but not on that question.

23           THE COURT:  Well here's what we're going to do.

24   The Court affords the plaintiff, Lerned, 30 days to

25   plead in the alternative any federal securities claims

1    she may have in good faith under Rule 11.  At the end of

2    that 30 days, the defense shall have 14 days

3    thereafter -- I mean the whole thing's been briefed, so

4    that's not harsh, to move to dismiss those claims.  The

5    Court will schedule another oral argument -- I do want

6    to hear you in your oral argument, and we will sort it

7    all out and go from there.

8         I'm not in any way rejecting your argument,

9    Mr. Gelb, I'm buying myself a month until you get to

10   make it with considerable force.

11        MR. GELB:  I only have one other point, your

12   Honor, which the PSLRA has an outside limit for the

13   statute of limitations, that the statute would impose,

14   so I would like the amended complaint to specify the

15   events with sufficient specificity, because the

16   dissolution took place in 2010.

17        THE COURT:  I said consistent with Rule 11, but

18   naturally it's consistent with all the federal rules of

19   civil procedure and it may be attacked on any ground.

20   And I thank you.

21        Thank you very much.  We'll take it under

22   advisement with instructions for those further

23   proceedings.  Thank you.  We'll recess.

24        (Ends, 2:40 p.m.)

25

1               C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, December 10,

8     2019, to the best of my skill and ability.

9

10

11

12     /s/ Richard H. Romanow 12-17-19
       _____
13     RICHARD H. ROMANOW    Date

14

15

16

17

18

19

20

21

22

23

24

25



**RUBIN** and
**RUDMAN** LLP
*Attorneys at Law*

53 STATE STREET I BOSTON, MA 02109 I P: 617-330-7000
800 CONNECTICUT AVENUE NW I WASHINGTON, DC 20006 I P: 202-794-6300
99 WILLOW STREET I YARMOUTHPORT, MA 02675 I P: 508-362-6262

Michael F. Connolly
Direct Dial: 617-330-7101
E-mail: mconnolly@rubinrudman.com
Return Address: Boston

January 10, 2020

***Via ECF and U.S. Mail***

Ms. Jennifer Gaudet
Courtroom Clerk to the
 The Hon. William G. Young
US District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA  02210

   **Re:**  **Sandra Colman Lerner v. Stephen Colman, et al**
       **Civil Action No. 1:19-cv-11738-WGY**

Dear Ms. Gaudet:

  On behalf of our client, plaintiff Sandra Colman Lerner, we respectfully write to advise the Court that we will not be amending the complaint in the above matter to add any federal securities claims.  Plaintiff's counsel having now, by the Court's leave, had the opportunity to carefully examine and research the issue, see no meritorious basis for the addition of any federal securities claim in the action.

  Ms. Lerner and her counsel are deeply appreciative of the Court's careful consideration and attentiveness at the December 10, 2019 hearing in identifying the issue and granting us the opportunity to explore the same.

             Very truly yours,

             Michael F. Connolly

MFC/lmy

cc:  Counsel of Record (via ECF and U.S. Mail)

2329957_1

67

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
SANDRA COLMAN LERNER,                   )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        CIVIL ACTION
                                        )        NO. 19-11738-WGY
STEPHEN J. COLMAN,                      )
DANIEL J. FLYNN III,                    )
JAMES CANAVAN, LISA LABRIQUE,           )
ELIZABETH COLMAN, KAREN REIDY,          )
KIRSTEN HUNT, and WILLIAM               )
CHRISTOPHER COLMAN,                     )
                                        )
                    Defendants.         )
_____)


YOUNG, D.J.                                     September 4, 2020

### MEMORANDUM AND ORDER

## I.   INTRODUCTION

This estate dispute has morphed into a civil action under
the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1964.  Susan Colman Lerner ("Lerner") alleges that
her cousin Stephen Colman ("Colman"), while participating in a
criminal enterprise, used his position as personal
representative of their uncle's estate to enrich his associates
and siblings at the expense of the estate.  Lerner also brings
Massachusetts law claims for breach of fiduciary duty, fraud,
and, with respect to Colman's siblings, money had and received.

Colman and the other defendants seek to dismiss her claims,

arguing that she fails properly to allege a RICO violation, that her RICO claims are barred, and that her state law claims are unavailing.

Lerner alleges Colman and his associates were involved in five different schemes.  Four of these schemes may not be used to develop a RICO claim, in accordance with section 107 of the Private Securities Litigation Reform Act, because they are actionable as securities fraud.  The last scheme, the Solar Resources scheme from which Lerner alleges injury, is not alone sufficient to sustain her RICO claims.  The defendants' motions to dismiss must therefore be granted as to Lerner's RICO claims. Since the RICO claims are the sole federal questions involved and there is no diversity jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining claims and therefore dismisses them for want of jurisdiction.

## II.   BACKGROUND

### A.   Factual Allegations

In October 2003, William Colman ("Bill Colman") formed Solar Resources, Inc. ("Solar Resources"), a Utah company, to develop land there for salt extraction.  Compl. ¶ 97, ECF No. 3. At the time, he was Solar Resources' sole owner and stockholder. Id.  Bill Colman's nephew Stephen became treasurer and secretary of Solar Resources in 2005.  Id. ¶ 98.

On December 11, 2011, Bill Colman died intestate on

[2]

Martha's Vineyard, leaving behind no children and no spouse. Id. ¶ 13.  His heirs-at-law were his twelve nieces and nephews. Id. ¶¶ 14-18.  Upon his uncle's death, Colman volunteered to serve as personal representative and took sole control of Bill Colman's estate.  The estate included Solar Resources, as well as Water Right 13-3457 in Utah (the "water right"), which Bill Colman acquired in 1984 and held in his personal capacity.  Id. ¶¶ 27-28, 96.

Two weeks before his death, Bill Colman's personal water right was transferred to Solar Resources.  Id. ¶ 99.  Stephen Colman then filed an Assignment of Water Right with the Utah Division of Water Rights on December 14, 2011, three days after Bill Colman's death, which was rejected.  Id. ¶ 101.  On January 4, 2012, Colman resubmitted the Assignment, which was then approved, completing the transfer of the water right to Solar Resources.  Id. ¶¶ 100-103.  The complaint alleges that Colman forged Bill Colman's signature to orchestrate this transfer without his knowledge.  Id.  As a result, the water right was not included in Bill Colman's estate when Stephen meted out its assets in probate.  Id. ¶ 104.

Shortly after his uncle's death, Colman became president of Solar Resources, and transferred a total of 53.5 percent of the company's shares to himself and two of his associates -- Daniel J. Flynn ("Flynn") and James Canavan ("Canavan") -- as well as

[3]

Bill Colman's ex-wife Phyllis and Colman's siblings (the "Siblings"): Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt, and William Christopher Colman.  Id. ¶¶ 105-129. Around the time of the transfers, Colman met with cousins Robert Colman, Roberta Colman, and Thomas Collins (but not Lerner), and informed them that he and his siblings had invested in Solar Resources.  Id. ¶¶ 123-125, 147.  Lerner learned of the stock transfers in 2018, when Collins told her about his meeting with Colman.  Id. ¶¶ 146-147.

In December 2012, Colman executed the stock sale of Solar Resources to Great Salt Lake Minerals Corporation ("GSLMC") for $11,000,000.  Id. ¶¶ 130, 132.  Bill Colman's estate received roughly $5,115,000 for its 46.5-percent stake in Solar Resources.  Id. ¶ 133.  Colman, his siblings, Phyllis Colman, Flynn, and Canavan split the proceeds from the remaining 53.5 percent of stock, albeit in unequal portions.  Id. ¶¶ 134-145.

### B.   RICO Allegations

Lerner claims the Solar Resource transfers were the work of a criminal enterprise composed of Colman, Flynn, and Canavan. Id. ¶¶ 35-50.  In her complaint, Lerner notes the various ties that bind the three men, who have known each other since high school and did business in the same building in Quincy, Massachusetts for several years.  Id. ¶¶ 35, 38-41.  From 1995 until 2014, Colman worked as general counsel for Flynn's

[4]

company, Daniel J. Flynn & Co. ("DJFCO"). Id. ¶ 38. Lerner claims the Solar Resources stock and water right transfers were the latest in the group's "series of fraudulent schemes to divert monies and assets from third parties in order to enrich themselves and others working with them." Id. ¶ 42.

To establish the existence of a criminal enterprise under RICO, Lerner alleges four predicate acts in addition to the Solar Resources scheme, two of which relate to a fraud conviction for which Flynn is currently serving a federal sentence.

First, Lerner alleges that Colman joined Flynn in soliciting investments in Flynn's DJF Real Estate Opportunity Fund ("DJF Fund") in 2008, and subsequently drafted false promissory notes to misrepresent the fund's holdings in its communications to other limited partners between 2010 and 2012.[1] Id. ¶¶ 51-57. Second, Lerner claims Colman, Canavan, and Flynn engaged in a Ponzi scheme involving a building on Greenleaf Street in Quincy (the "Greenleaf Property"), which Flynn purchased in 2005. Id. ¶¶ 58-69. She alleges Flynn obtained loans and other investments ostensibly related to the purchase and development of the Greenleaf Property, which were instead

---

[1] Flynn and his general partner, Alex Petro, signed the communications. Compl. ¶ 53. Petro died by suicide in December 2014. Id. ¶ 57.

[5]

"used . . . to repay earlier investors and fraud victims from their other schemes." Id. ¶ 67.  Lerner claims Colman drafted loan documents, promissory notes, and false purchase and sale agreements for Flynn, while Canavan "conducted . . . residential real estate work and closings." Id. ¶ 58.

On February 1, 2017, Flynn pleaded guilty to nine counts of federal mail and wire fraud arising from a series of schemes that occurred between 2007 and 2015, including the DJF Fund and Greenleaf Property schemes.  Id. ¶ 44; see also Indictment ¶¶ 6-13, 17-23, United States v. Flynn, Crim. A. No. 15-10283 (D. Mass. 2017) (Zobel, J.), ECF No. 12 ("Flynn Indictment"); Electronic Clerk's Notes, id., ECF No. 39.  As part of his criminal sentence Flynn agreed to pay more than $20,000,000 in restitution to seventy-three victims.  Assented Motion Joint Restitution Order, Flynn, Crim. A. No. 15-10283, ECF No. 58.

Third, Lerner claims Colman, Canavan, and Flynn fraudulently took control of a property on East Howard Street in Quincy (the "East Howard Street Property").  Compl. ¶¶ 70-86. In 2002, Flynn, acting on behalf of DJFCO, entered into a listing agreement with LINC Property I, LLC ("LINC"), a Delaware company doing business in Massachusetts, to act as its agent in selling the East Howard Street Property.  Id. ¶ 70, 72.  The following year, LINC struck a purchase and sale agreement with the Des Moines Street Realty Trust for $825,000.  Id. ¶ 74.

[6]

Unbeknownst to LINC, Flynn had an interest in this trust, and Canavan was a trustee.  Id. ¶¶ 74-75.  Around the same time, Flynn negotiated the sale of the East Howard Street Property to George Brewster ("Brewster") for $1,325,000 and pocketed the $500,000 windfall.  Id. ¶¶ 77-78, 80-81.

Fourth and finally, Lerner claims Flynn obtained from Brewster financing for investment properties in Massachusetts and Rhode Island through a nonexistent entity.  Id. ¶¶ 87-94. Brewster invested $1,600,000 in "Patriot Acquisition," which Lerner claims Flynn then shuffled to an entity named Patriot Investments, LLC, without providing any benefit to Brewster. Id. ¶¶ 91, 93-94.[2]  Colman himself was the listed manager of Patriot Investments, LLC.  Id. ¶¶ 93-94.

Lerner alleges three RICO violations (counts I-III).  Id. ¶¶ 153-185.  Under Massachusetts law, she alleges breach of Colman's fiduciary duty as personal representative of Bill Colman's estate (count IV), id. ¶¶ 186-189; fraud arising from the Solar Resources stock transfers and sale (count V), id. ¶¶ 190-198; and a claim for money had and received against the Siblings (count VI).  Id. ¶¶ 199-206.  She seeks damages -- including treble damages and reasonable attorney's fees and

---

[2] Brewster brought an action for fraud against DJFCO, Flynn, Colman and Canavan, after Canavan admitted the fraud to him. Compl. ¶¶ 71, 84.

costs as provided under section 1964(c) -- as well as injunctive relief.

This Court has federal question jurisdiction over Lerner's claims because her cause of action arises under section 1964(c) of the RICO statute.  28 U.S.C. § 1331.

### C.  Procedural History

Lerner filed suit in this Court on August 12, 2019.  See Compl.  On September 13, 2019, Colman moved to dismiss Lerner's complaint for failure to state a claim.  Def. Colman's Mot. Dismiss, ECF No. 25; Def. Colman's Mem. Supp Mot. Dismiss ("Colman Mem."), ECF no. 26.  The Siblings moved to dismiss Lerner's claims on September 23, 2019, and joined Colman's motion.  Defs.' Mot. Dismiss, ECF No. 29.  Canavan likewise moved to dismiss on October 7, 2019.  Def. Canavan Mot. Dismiss, ECF No. 40; Def. Canavan Mem. Supp. Mot. Dismiss ("Canavan Mem."), ECF No. 41.

Lerner filed her opposition to Colman and the Siblings' motions on October 15, 2019, Pl.'s Opp'n Mot. Dismiss ("Pl.'s Opp'n Colman"), ECF 43, followed by her opposition to Canavan's motion on October 21.  Pl.'s Opp'n Canavan Mot. Dismiss ("Pl.'s Opp'n Canavan"), ECF No. 44.

This Court held a hearing on the motions on December 10, 2019.  Elec. Clerk's Notes, ECF No. 45; Tr. Mot. Dismiss Hr'g ("Hr'g Tr."), ECF No. 47.  At the hearing, Lerner agreed to

consider amending the complaint by re-pleading the RICO claims in the alternative as securities fraud claims, id., but ultimately decided that there was no basis for doing so.  Letter Michael Connolly, ECF No. 48.

## II.  ANALYSIS

### A.  Legal Standard and Preliminary Issues

#### 1.    Standard of Review

In order to survive a motion to dismiss, a complaint must "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint must contain sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  This Court will "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but it will disregard statements that "merely offer legal conclusion[s] couched as . . . fact[ ] or [t]hreadbare recitals of the elements of a cause of action," Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (alterations and omission in original) (internal quotation marks omitted)).  "A 'formulaic recitation of the elements of a cause of action' is not enough."  Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd., 140 F. Supp. 3d 138, 140 (D. Mass. 2015) (quoting Twombly, 550 U.S. at 555).

[9]

### 2.   Heightened Pleading Standard for Fraud

Federal Rule of Civil Procedure 9(b) creates a heightened

pleading standard for allegations of fraud, under which "a party

must state with particularity the circumstances constituting

fraud or mistake," though the elements of "[m]alice, intent,

knowledge, and other conditions of a person's mind may be

alleged generally."  Where, as here, "the predicate acts

supporting a RICO claim sound in fraud, the plaintiff must

assert all elements of his RICO claim according to the

heightened pleading requirements of Fed. R. Civ. P. 9(b)."

System Mgmt., Inc. v. Loiselle, 91 F. Supp. 2d 401, 408 (D.

Mass. 2000) (citing Feinstein v. Resolution Trust Corp., 942

F.2d 34, 42 (1st Cir. 1991)).  Colman argues that Lerner has

failed to plead any of the predicate acts involving fraud with

the requisite specificity under Rule 9(b).  Colman Mem. 12-14.

The goal of Rule 9(b) is "to give adequate notice of the

plaintiff's claim of fraud."  McGinty v. Beranger Volkswagen,

Inc., 633 F.2d 226, 228-29 (1st Cir. 1980).  This heightened

pleading standard for mail and wire fraud typically requires a

plaintiff to provide the "time, place and content" of the

allegedly fraudulent communications.   Ahmed v. Rosenblatt, 118

F.3d 886, 889 (1st Cir. 1997) (dismissing RICO claim for failure

to plead with particularity).  Where mail fraud is alleged as

the predicate act, plaintiffs must allege "(1) a scheme to

[10]

defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of that scheme." United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004). Notably, reliance is not an element of federal wire fraud, nor of a RICO claim based on wire fraud. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649 (2008).

This Court disagrees with Colman that the claims must be dismissed under Rule 9(b) because Lerner's complaint sufficiently alleges the time, place, and content of each of the alleged schemes to survive scrutiny under Rule 9(b). First, Lerner sufficiently alleges the fraudulent conduct at issue in the Solar Resources scheme: the allegedly fraudulent transfer of the water right from Colman's estate to Solar Resources; the allegedly fraudulent transfer of stock from Solar Resources to Colman, Flynn, Canavan, and Colman's family; and the allegedly fraudulent communication from Flynn to Colman inducing her consent to the sale of Solar Resources. Compl. ¶ 160. Lerner lists the date, parties, and content of each of these communications or actions. Id. For example, with respect to Colman's communications with the Utah Division of Water Rights, Lerner alleges that Colman sent messages on December 14, 2011 and January 4, 2012, and names the type of documents Colman

[11]

78

sent.  Id. ¶¶ 160(g), 160(t).  Lerner's "conclusory" allegation
that these communications were fraudulent is sufficient, Colman
Mem. 13, as a party at the pleading stage need not provide
actual evidence of intent or knowledge.  McGinty, 633 F.2d at
228.  Lerner also sufficiently pleads the elements of wire and
mail fraud because she alleges material false pretenses,
Colman's knowledge and intent, and the use of interstate
communications for the three interlocking, allegedly fraudulent
acts (the water rights transfer, the stock transfers, and the
inducement of her consent).  Compl. ¶ 160; see Bonilla v. Volvo
Car Corp., 150 F.3d 62, 66-67 (1st Cir. 1998).

Lerner makes similarly detailed allegations for each of the
four alleged Flynn-led schemes.  For example, for the DJF
Opportunity Fund Scheme, Lerner states that Colman drafted
fraudulent subscription agreements in January 2008 for twenty-
five individuals, and caused them to be sent by email or mail to
partners in Massachusetts, New York, California and elsewhere.
Compl. ¶¶ 51-52.  With respect to intent she pleads that Colman
and/or Canavan forged signatures on promissory notes in support
of the fraudulent scheme.  Id. ¶¶ 54-56.  The allegations are
similarly detailed for the other three predicate schemes.  Id.
¶¶ 58-94.  In fact, Lerner is able to pinpoint the exact dates
that many of the allegedly fraudulent communications were sent
to investors.  Id. ¶ 169.

[12]

In conclusion, Lerner's pleadings are sufficiently detailed to survive Colman's Rule 9(b) challenge.

### 3.   Time Bar

Colman argues that Lerner's RICO claims are time barred because the RICO statute of limitation is four years, the alleged fraudulent concealment of his stock transfer occurred in 2012, and Lerner does not plead with sufficient particularity that the existence of the fraud was concealed from her.  Colman Mem. 19 (citing Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987)).  Under the injury discovery accrual rule, the clock begins to tick on a RICO claim when the plaintiff knows or should know of her injury, or in other words, when she receives "storm warnings" of potential fraud.  Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 626 (1st Cir. 2019) (quoting Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002)). Once a reasonable person receives sufficient notice of potential injury as to give rise to suspicion, the statute of limitation will begin to run unless she diligently investigates, and she is charged with knowledge of those facts that would have been available after such investigation.  McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004).  The test of whether a plaintiff "should have" suspected fraud is objective.  Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987).

Lerner alleges in her complaint that she first learned of

[13]

the 2012 meeting between Colman and the other family members, at
which he told them the shares of Solar Resources were
investments rather than gifts, in 2018, which raised her
suspicion of fraud.  Compl. ¶ 117.  Arguably, Lerner could have
become suspicious when she learned that some members of the
family had received stock transfers as "gifts," id., and indeed
it appears from her complaint that she did ask Colman for an
explanation before ultimately signing her consent to the
transfers.  Id. ¶ 129; Colman Mem., Ex. 1, Consent to Petition
and Order, ECF No. 26-1.  There is significantly less notice of
potential fraud here than was present in other cases where
courts have found such notice to exist, however.  See, e.g.,
Painters & Allied Trades Dist. Council 82 Health Care Fund v.
Forest Pharms., Inc., 915 F.3d 1, 14-15 (1st Cir. 2019)
(existence of other lawsuits after unsealing of government
complaint against company triggered inquiry notice); Morales-
Melecio v. United States (HHS), 890 F.3d 361, 369 (1st Cir.
2018) (death certificate indicating septic shock triggered
inquiry notice of medical malpractice).  The situation here
appears more like Stanley v. Schimdt, where another session of
this Court determined that neither the fact that a broker was
investing in overly risky securities, nor that he disclosed
conflicts of interest, triggered inquiry notice for potential
securities fraud.  369 F. Supp. 3d, 297, 309-310 (D. Mass. 2019)

[14]

(Gorton, J.).   Still, "[t]his inquiry is highly fact- and case-specific."   McIntyre, 367 F.3d at 52.   Taking all inferences in favor of the non-moving party, Lerner has pled sufficient facts to allow the inference that she could not have reasonably learned of Colman's deceit until 2018, and therefore that her claims are not time barred.

### B.   Counts I-III: Civil RICO

Lerner brings a private cause of action under RICO, 18 U.S.C. § 1964(c), and alleges violations of sections 1962(c) (count I), 1962(a)-(b) (count II), and 1962(d) (count III).

Lerner's first claim is for violation of section 1962(c). Compl. ¶¶ 153-161.   In order to state a section 1962(c) RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985) (footnote omitted).   A plaintiff may pursue a civil action under RICO only if she "can demonstrate (1) a violation of section 1962, and (2) harm 'by reason of' the violation.   The harm alleged may be either 'direct' or 'indirect,' so long as it 'flows from' the predicate acts."   Willis v. Lipton, 947 F.2d 998, 1000 (1st Cir. 1991) (internal citations omitted).   It is sufficient for purposes of standing to show injury from only one of the predicate acts.   Pelletier v. Zweifel, 921 F.2d 1465, 1497 (11th Cir. 1991).

[15]

Though Lerner explicitly lists only the activity related to Solar Resources under this claim, Compl. ¶ 169, the claim incorporates her allegations regarding the other Flynn-led schemes, and she considers them all part of a single enterprise. Id. ¶¶ 162, 165.  Lerner alleges that between 2008 and 2011, Colman caused transfers of Solar Resources stock to Flynn, the Siblings, Phyllis Colman, and himself without Bill Colman's authorization, "knowing such stock was taken by fraud" in violation of the National Stolen Property Act, 18 U.S.C. § 2314, and 18 U.S.C. §§ 471-473.  Compl. ¶¶ 159, 160a.  Additionally, Lerner claims Colman committed mail and wire fraud, 18 U.S.C. §§ 1341, 1343, by procuring her consent to the sale of Solar Resources in August 2012 through interstate wire without disclosing (1) the transfer of the water right from Bill Colman to Solar Resources and (2) the transfer of more than half of Solar Resources' stock to Colman, Flynn, the Siblings, and Phyllis Colman.  Compl. ¶ 160h.  Lerner claims that Colman, Canavan, and Flynn comprise an association-in-fact enterprise, which was active from 1999 until Flynn's indictment in 2015, and that this enterprise committed a pattern of racketeering activity consisting of the Solar Resources scheme and the four Flynn-led investment schemes.  Compl. ¶¶ 155-160.  The viability of this claim depends on the applicability of section 107 of the

Private Securities Litigation Reform Act, which will be discussed _infra_.

Lerner's second claim, for violation of sections 1962(a) and (b), is easily disposed of due to inadequate pleading. Section 1962(a) makes it unlawful for any person to use income derived from a pattern of racketeering activity to acquire an interest in a business or operation involved in interstate commerce.  18 U.S.C. § 1962(a).  An allegation that the defendant harmed the plaintiff solely and directly through a predicate act (as opposed to through the use of income derived from the racketeering) does not meet the requirement of this section.  See, e.g., Abraham v. Singh, 480 F.3d 351, 356-57 (5th Cir. 2007).  Section 1962(b) makes it unlawful for a party to acquire an interest in a business directly through racketeering activity.  18 U.S.C. § 1962(b).  As with section 1962(a), an allegation that the defendant harmed the plaintiff directly through the predicate act is insufficient; the injury must come as a result of the defendant using racketeering activity to gain an interest in a business.  See Compagnie De Reassurance D'Ile De Fr. v. New Eng. Reinsurance Corp., 57 F.3d 56, 92 (1st Cir. 1995); P.R. Med. Emergency Group, Inc. v. Iglesia Episcopal Puertorriqueña, Inc., 118 F. Supp. 3d 447, 459 (D.P.R. 2015).

In making this claim, Lerner describes the four Flynn-led schemes and the Solar Resources scheme, draws a connection

[17]

between them, and labels the entire course of conduct a "pattern of racketeering activity." Compl. ¶ 168-178.  Lerner alleges that she has been damaged by this scheme due to her status as a beneficiary of William Colman.  Id. ¶ 179.  The problem is that in count II Lerner has thoroughly alleged a RICO enterprise in accordance with section 1962(c), but not 1962(a) or (b); she does not allege that the defendants used the income or influence derived from their racketeering enterprise to enable the Solar Resources scheme, but instead that they directly gained control of it through fraud.  Id. ¶¶ 168, 179.[3]  Her allegation that Flynn reinvested his ill-gotten gains back into his own real estate holdings is insufficient because her injury was unrelated to these investments.  Id. ¶ 168; cf. Ouaknine v. MacFarlane, 897 F.2d 75, 83 (2d Cir. 1990).

The problem with Lerner's pleading echoes the pleading considered in Abraham v. Singh, where the Fifth Circuit upheld a district court's dismissal of charges under sections 1962(a) and (b), but reversed for sections 1962(c) and 1962(d) (conspiracy to commit a RICO violation).  480 F.3d at 356-57.  That case involved claims by a group of Indian citizens alleging human

---

[3] For an example of a proper 1962(a) allegation, see System Mgmt., 91 F. Supp. 2d at 415-17 (ruling plaintiff had made a valid 1962(a) claim by alleging the defendants had used income derived from unlawful underpayment of wages to subsidize lower contract bids, and therefore injure them by underbidding for contracts).

[18]

trafficking: they came to the United States after being promised well-paying jobs and permanent residence, only to have their passports confiscated and wages stolen.  <u>Id.</u> at 353-54.  The Fifth Circuit explained that these charges did not match subsections 1962(a) or (b) because there was no connection between the workers' injuries and the defendant acquiring an interest in a company, but the scheme as a whole could certainly qualify as a racket, allowing claims under subsections 1962(c) and (d).  <u>Id.</u> at 356-57.  This pleading requirement reflects the purpose of these sections.  While the RICO laws on the whole may be used to target a wide variety of rackets, <u>Sedima</u>, 473 U.S. at 497, subsections (a) and (b) have the narrower original purpose of targeting organized crime that uses ill-gotten profits, threats, coercion, or debt to gain control of legitimate business.  <u>Lightning Lube, Inc.</u> v. <u>Witco Corp.</u>, 4 F.3d 1153, 1188, 1190 (3d Cir. 1993).

Finally, Lerner brings her third claim under section 1962(d), which prohibits conspiracy to commit a RICO violation. 18 U.S.C. § 1962(d).  To establish a conspiracy under section 1962(d), it is sufficient to prove that the defendant agreed with one or more individuals to commit at least two predicate offenses in violation of subsection 1962(a), (b) or (c).  <u>Aetna Casualty Surety Co</u>. v. <u>P & B Autobody</u>, 43 F.3d 1546, 1562 (1st Cir. 1994) (citing <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230, 252

[19]

(1st Cir. 1990)).  This count is dependent on the existence of another viable RICO claim.  See Beck v. Prupis, 529 U.S. 494, 507 (2000)

### 1.   The Private Securities Litigation Reform Act Exception

The first step in analyzing liability under subsections 1962(c) and (d) is to determine which alleged predicate acts support viable RICO causes of action.  Colman argues that Lerner's RICO claims must be dismissed because "the predicate acts alleged by her are grounded in securities fraud which is exempt from liability under RICO."  Colman Mem. 15.  This argument refers to section 107 of the 1995 Private Securities Litigation Reform Act (PSLRA), which modified section 1964(c) by barring a private plaintiff from relying on "conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c).

Colman argues that the four schemes allegedly led by Flynn cannot be used as predicate acts because they involve promissory notes and securities fraud.  Colman Mem. 15.  At oral argument, Colman clarified that this argument applied only to the four Flynn-led transactions, under the theory that Colman's alleged actions with respect to Solar Resources did not involve the "purchase and sale" of a security and therefore could not have

[20]

been part of the same RICO "scheme" as the Flynn-led
transactions.  Hr'g Tr. 7-9.  The Second Circuit has treated the
invocation of the PSLRA exception as an affirmative defense,[4] so
the Court will limit its analysis of the PSLRA exemption to the
four Flynn-led schemes.  <u>See</u> <u>Gilmore</u> v. <u>Gilmore</u>, 503 Fed. Appx.
97, 99 (2d Cir 2012).[5]

When it passed the Private Securities Litigation Reform Act
in 1995, "Congress meant not only to 'eliminate securities fraud
as a predicate offense in a civil RICO action, but also to
prevent a plaintiff from pleading other specified offenses, such
as mail or wire fraud, as predicate acts under civil RICO if
such offenses are based on conduct that would have been
actionable as securities fraud.'"  <u>Calderon Serra</u> v. <u>Banco</u>
<u>Santander Puerto Rico</u>, 747 F.3d 1, 4 (1st Cir. 2014) (quoting
<u>Bald Eagle Area Sch. Dist.</u> v. <u>Keystone Fin., Inc.</u>, 189 F.3d 321,
327 (3d Cir. 1999)); <u>see</u> <u>Mathews</u> v. <u>Kidder, Peabody & Co., Inc.</u>,
161 F.3d 156, 170 (3d Cir. 1998) (detailing the PSLRA's
legislative history).  Consequently, this Court must make "a

---

[4] As Colman has stated he is not waiving any affirmative
defenses, he would be able to argue at a future stage of these
proceedings that the PSLRA exception should apply to the alleged
actions in the Solar Resources scheme, should he determine such
an argument to have merit.  <u>See</u> Colman Mem. 2 n.1.  Furthermore,
the reasoning from <u>Gilmore</u> suggests that he could raise this
defense at a later stage of the proceedings even if he had not
explicitly reserved his rights.  503 Fed. Appx. at 97.
[5] Canavan has joined all of Colman's arguments on this point
without raising any new ones of his own.  <u>See</u> Canavan Mem. 6.

[21]

sort of reverse Rule 12(b)(6) inquiry," <u>Calderon Serra</u>, 747 F.3d at 4, to determine whether the conduct Lerner alleges would be "actionable as fraud in the purchase or sale of securities."  18 U.S.C. § 1964(c); <u>see</u> <u>Bald Eagle</u>, 189 F.3d at 330 ("[T]he proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud . . . .").

Although section 1964(c) does not specify which statute this Court should use as its benchmark for an actionable securities fraud claim, the First Circuit has relied upon section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and U.S. Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  <u>See</u> <u>Calderon Serra</u>, 747 F.3d at 4 (noting that "actions for fraud in the purchase or sale of securities often arise" under section 10(b) and Rule 10b-5). These provisions target fraud "in connection with the purchase or sale" of securities.  <u>Blue Chip Stamps</u> v. <u>Manor Drug Stores</u>, 421 U.S. 723, 733 (1975).  Therefore, this Court must determine "whether the RICO counts in the plaintiff's Complaint 'rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities'" under section 10(b) or Rule 10b-5.  <u>Chase</u> v. <u>Merson</u>, 384 F. Supp. 3d 106, 111 (D. Me. 2019) (footnote omitted) (quoting <u>Bald Eagle</u>, 189 F.3d at 327).

[22]

Actionable by whom?  Neither this Court nor the First Circuit has addressed whether the PSLRA exception applies where the RICO plaintiff herself could not bring an action for securities fraud.  <u>See</u> Pl.'s Opp'n Colman 22-23.  In other words, does a civil RICO suit run afoul of the PSLRA only when the securities fraud alleged is actionable by the RICO plaintiff, or does the PSLRA bar kick in so long as the securities fraud is actionable by anyone?

Before answering this question, the Court must first determine if the four Flynn-led schemes would be actionable as securities fraud by anyone.  This Court is not concerned that Lerner is engaging in "surgical" pleading -- after all, as Lerner points out, the government chose to indict Flynn on wire and mail fraud, not securities fraud, Pl.'s Opp'n Colman 21 -- but the approach used in several circuits would bar Lerner from relying upon these as predicate acts if <u>anyone</u> would have standing to bring these securities fraud claims.  <u>See, e.g.</u>, <u>MLSMK Inv. Co.</u> v. <u>JP Morgan Chase & Co.</u>, 651 F.3d 268, 278 (2d Cir. 2011).  Because of the concern over "surgical" pleading, the PLSRA exception applies regardless of whether the complaint contains the elements and technical requirements for pleading securities fraud, so long as the elements are evident from the pled facts.  <u>Bald Eagle</u>, 189 F.3d at 330.

[23]

"A typical 10b-5 securities fraud claim requires proof of:
(1) a material misrepresentation or omission; (2) scienter, or a
wrongful state of mind; (3) a connection with the purchase or
sale of a security; (4) reliance; (5) economic loss; and (6)
loss causation." Calderon Serra, 747 F.3d at 4 (internal
quotation marks omitted) (quoting Hill v. Gozani, 638 F.3d 40,
55 (1st Cir. 2011)).  For all four of the alleged Flynn-led
schemes, Colman has pled facts indicating that some party could
bring a claim that satisfies all six elements of 10b-5
securities fraud, though the third factor -- the connection to
the purchase or sale of a security -- requires some unpacking.
See Compl. ¶¶ 54-57, 169a-e, 171a (alleging misrepresentation,
scienter, reliance, loss, and loss causation for the DJF Fund
scheme); id. ¶¶ 67-69, 169d, 171b (Greenleaf Property scheme);
id. ¶¶ 78-86 (East Howard Street Property scheme); id. ¶¶ 88-94
(Patriot Investments scheme).

The Securities Exchange Act of 1934 defines a security as
any note, bond, investment contract, and so forth that allows
for participation in a profit-sharing enterprise (excluding
instruments that mature in excess of nine months).  15 U.S.C. §
78c(a)(10).  Congress defined securities in sufficiently broad
and general terms so as to include virtually any instrument that
may be sold as an investment.  Reves v. Ernst & Young, 494 U.S.
56, 60-61 (1990) (citing United Housing Found., Inc. v. Forman,

[24]

421 U.S. 837, 847-49 (1975)).  Determining whether an instrument is a security is a question of economic reality rather than form.  Forman, 421 U.S. at 851-52.  The federal securities laws govern fraud that occurs face to face as well as fraud in an organized market.  Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 12 (1971).

The alleged fraud in the DJF Fund scheme is actionable (by someone) as securities fraud because it involves the type of security called an investment contract.  See SEC v. W. J. Howey Co., 328 U.S. 293, 298-99 (1946).  Howey explains that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party."  Id.  In other words, the investor is "attracted solely by the prospects of a return on their investment."  Id. at 300.  In contrast, a real estate contract whose purpose is to allow an individual to buy property for commercial or personal use is not a security. Forman, 421 U.S. at 852-53.  Lerner labels the organization an "investment fund," and her description of it in the complaint indicates that participants pooled their assets expecting collectively to receive a return through the growth of their investments rather than because they were trying collectively to run a business out of the chosen properties.  See Compl. ¶ 51;

[ 25 ]

SEC v. SG Ltd., 265 F.3d 42, 50 (1st Cir. 2001) (noting that
Howey requires the existence of a common enterprise and holding
that "horizontal commonality" -- pooled assets of investors that
share in the profits and risk of an enterprise -- is the proper
test).

The other three schemes -- Greenleaf Property, East Howard
Street Property and Patriot Acquisition -- must be analyzed
under the standard from Reves that pertains to promissory notes,
since they do not involve solely the type of pooled investment
fraud alleged in the first scheme.  494 U.S. at 64-65.  There is
a presumption that such notes are securities, but this
presumption can be rebutted by a showing that they were issued
for the purpose of enabling commerce, rather than investment.
Id.  The test is whether such instruments bear a "family
resemblance" to non-securities, relying on four factors: whether
it was issued to generate investment profit rather than finance
commercial operations; whether the "plan of distribution"
indicates it is intended for speculation or investment; whether
a reasonable investor would consider it a security; and whether
another regulatory scheme significantly governs the transaction,
making application of the Securities Act unnecessary.  Id. at
66-67.

The first Reves factor leans in favor of finding these
schemes to involve securities because there is no indication

[26]

that the selling and buying of these properties were for
commercial purposes, and there are many indicia throughout the
complaint that these transactions were done for the purpose of
investment.  See, e.g., Compl. ¶¶ 58 (terming the victims of the
Greenleaf Property schemes "investors"), 67 (alleging Greenleaf
Property to be essentially a Ponzi scheme where money from
earlier investors was used to pay previous investors), 87
(referring to Patriot Acquisition as an "investment
opportunity"); see also Bald Eagle, 189 F.3d at 300 ("[C]onduct
undertaken to keep a securities fraud Ponzi scheme alive is
conduct undertaken in connection with the purchase and sale of
securities.").  The complaint is somewhat unclear as to whether
the East Howard Street Property transactions were for investment
or commercial use, but Lerner clarifies the issue by referring
to Brewster -- one of the buyers -- as an "investor" in her
Opposition.  Pl.'s Opp'n Colman 5.  Even if some of the
transactions were commercial or had commercial components, when
the scheme as a whole is intertwined with and supports
securities fraud then it is "in connection with the purchase or
sale of securities." Bald Eagle, 189 F.3d at 330.  The second
factor is not well-developed in the complaint, but the third
factor also points in favor of finding these transactions to be
securities: the Greenleaf Property and East Howard Street
Property schemes were done by and through DJFCO, Compl. ¶¶ 60,

[27]

70, and Flynn sold the Patriot Investments scheme as an investment opportunity, id. ¶ 88.  There is no countervailing regulatory regime that counsels against finding these transactions to be securities under the fourth factor.  On balance, all these alleged schemes are therefore actionable as securities under the "reverse 12(b)6 inquiry."  Calderon Serra, 747 F.3d at 4.

As Lerner herself would not have standing to bring these claims because those schemes did not injure her, the next question is whether the PSLRA bars her reliance on these alleged schemes as predicate acts.  The Second Circuit conducted the most in-depth treatment of this question when it endorsed an actionable-by-anyone approach, ruling the PSLRA precluded the plaintiffs from bringing a RICO claim for aiding and abetting securities fraud, when they were statutorily barred from suing directly.  See MLSMK, 651 F.3d at 273-80 (ruling the section 1964(c) bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant").  The Ninth Circuit has also ruled that section 1964(c) bars any conduct actionable as securities fraud, regardless of the RICO plaintiff's standing to bring such a claim.  Howard v. Am. Online Inc., 208 F.3d 741, 749 (9th Cir. 2000), cert. denied, 531 U.S. 828, 121 (2000) (holding securities claims that "could be brought by a plaintiff with proper standing" were actionable

[28]

and therefore barred).  The majority of district courts considering the issue without clear guidance from their Circuits have following <u>MLSMK</u> in ruling that the PSLRA applies if any party would have standing to bring a claim.  <u>See, e.g.</u>, <u>Capital Inv. Funding, LLC</u> v. <u>Field</u>, Civ. A. No. 6:13-2326, 2015 U.S. Dist. LEXIS 8206 *11 (S.C. Jan. 20, 2015); <u>Amos</u> v. <u>Franklin Fin. Servs. Corp.</u>, Civ. No. 10-1285, 2011 U.S. Dist. LEXIS 134431 at *15 (M.D. Penn. Noc. 22, 2011).  In an unpublished opinion, the Eleventh Circuit has summarized this trend (without itself ruling on the standing issue): "courts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim." <u>Licht</u> v. <u>Watson</u>, 567 Fed. Appx. 689, 693 (11th Cir. 2014).

Lerner urges this Court instead to adopt a narrower interpretation of section 1964(c).  Pl.'s Opp'n Colman 23 (citing <u>Menzies</u> v. <u>Seyfarth Shaw LLP</u>, 197 F. Supp. 3d 1076 (N.D. Ill. 2016), <u>aff'd in part</u>, 943 F. Supp. 3d 328 (7th Cir. 2019) (affirming the district court's analysis of section 107 of the PSLRA)).  In <u>Menzies</u>, Judge Blakey looked closely at the language of the PSLRA exception:

> [A] plain reading of the phrase 'any conduct that
> would have been actionable' means conduct that: (1)
> injured a person's business or property (and is thus
> being relied upon by that person to establish a RICO
> violation); and (2) would have been actionable as

[29]

> fraud in the purchase or sale of securities.  When
> such injurious 'conduct' to the RICO 'person' could
> also trigger an 'action' for remedies under the
> securities laws, then it constitutes 'actionable'
> conduct under the exception.  As such, the term
> 'actionable' conduct means injuries to the 'person'
> that he could use to seek a remedy via a private
> securities fraud action, or the same injurious conduct
> to such person that could otherwise be remedied via a
> public action filed by the SEC.

Menzies, 197 F. Supp. 3d. at 1107.  Securities fraud injuring

someone other than the RICO plaintiff is not "actionable" within

the meaning of the PSLRA exemption, Judge Blakey explained,

because "it does not relate to the 'conduct' being relied upon

by the 'person' bringing suit to address 'his' injury to

business or property."  Id.

Statutory interpretation begins with the language of the

statute.  United States v. Ron Pair Enters., 489 U.S. 235, 241

(1989); Stornaweye Fin. Corp. v. Hill (In re Hill), 562 F.2d 29,

32 (1st Cir. 2009).  Extrinsic material such as legislative

history may be consulted to the extent it sheds light on the

Legislature's understanding of ambiguous terms.  Exxon Mobil

Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).

This Court finds the statutory analysis in Menzies to be

perfectly plausible but disagrees that the text is so clear as

to be unambiguous.  Menzies places the weight of its analysis on

the grammatical connection of the word "actionable" to the

"person" who has been injured, but other courts have made an

[30]

equally plausible argument that "actionable" should be read on its own.  See, e.g., Howard, 208 F.3d at 749 (placing emphasis on whether "any conduct" is actionable); Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.), 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) (noting the absence of explicit language connecting "actionable" to the person injured).

The First Circuit has looked in the past to legislative history to interpret another contested clause of the PSLRA, so this Court does so now.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999).  The legislative history is not entirely clear, however.  The Second Circuit pointed out that the Conference Committee Report for section 107 of the PSLRA explained that Congress "'intend[ed]' that the section would 'eliminate securities fraud as a predicate offense in a civil RICO action'" and further noted that Congress's purpose was to "remove [as a predicate act of racketeering] any conduct that would have been actionable as fraud . . .'"  MLSMK, 651 F.3d at 278-279 (quoting H.R. Rep. 104-369, at 47 (1995) (Conf. Rep.) and citing S. Rep. 104-98, at 19) (brackets and emphasis provided by Second Circuit).  MLSMK also emphasized that Congress was aware that the exception would remove some types of claims (including aiding and abetting claims, at issue in that case) from RICO liability, but that it concluded the securities

[31]

laws "generally provide adequate remedies for those injured by securities fraud."  Id. (quoting S. Rep. 104-98, at 19).

Menzies expands this legislative history by looking to its "entirety."  197 F. Supp. 3d at 1114.  What that analysis shows is that the final language of the PSLRA bill was the result of a series of compromises between members of Congress, some of whom favored a more expansive standard that would bar any predicate act that "involved" securities fraud, and others who saw such language as stripping injured investors of a remedy.  Id. at 1112-14.  The final compromise bill included both the current "any conduct that would be actionable" language and the "conviction exception" that allows for securities fraud to be used as a predicate act for parties who have been convicted. Id. at 1113.  Judge Blakey characterizes this final bill as "narrower" in terms of the type of conduct covered than the initially proposed "involves" standard, which is clearly correct, but the legislative history he cites indicates that the battle lines were drawn over the span of fraud exempted by the bill, not over the "actionable-by-whom" standard at issue in this case.  Id. at 1112-13.  Overall, the courts have been able to cite general propositions in the congressional record that support their interpretation, but not a precise citation to the congressional record specifically addressing this exact issue. Compare id. at 1114 (quoting Securities Litigation Reform

[32]

99

<u>Proposals S. 240, S. 667, and H.R. 1058: Hearings Before the</u>
<u>Subcomm. on Securities of the S. Comm. on Banking, Housing, and</u>
<u>Urban Affairs</u>, 104th Cong. 251 (1995) (statement of Arthur
Levitt, Chairman of the SEC) (emphasizing the need to provide
adequate remedies), <u>with</u> <u>MLSMK</u>, 651 F.3d at 278-79 (quoting H.R.
Rep. 104-369, at 47) (noting congressional intent to eliminate
securities fraud as a predicate offense in a civil RICO action).

All in all, the congressional record itself appears to be
ambiguous.  Perhaps this ambiguity was the result of Congress
not considering this precise pattern of facts, or perhaps it was
intentional.  If the latter, "at best there appears to have been
an agreement to disagree . . . and perhaps, as is common, to
leave such matters for courts to resolve." <u>Greebel</u>, 194 F.3d at
195.  On the current question, the majority of courts have
resolved the issue by ruling the PSLRA to be broadly preclusive
under the "actionable-by-anyone" standard, and this Court deems
their analysis persuasive. <u>See</u> <u>MLSMK</u>, 651 F.3d 268.  The
countervailing position espoused by the district court in
<u>Menzies</u> is extremely thorough and thoughtful but ultimately does
not persuade this Court that the PSLRA bar is so limited.
Moreover, the Court observes that joining the majority position
has the benefit of increasing predictability and preventing
forum-shopping.  The Court rules that the PSLRA bars reliance on

[33]

the four Flynn-led schemes as predicate acts for Lerner's RICO claims since those schemes are actionable as securities claims.

One other matter requires attention in this context.  The PLSRA "conviction exception" allows suits against persons like Flynn who have been convicted for fraud.  <u>See</u> 18 U.S.C. § 1964(c); <u>In re Enron Corp.</u>, 284 F. Supp. 2d at 623 (collecting cases).  Courts have consistently held, however, that this exception is available only to the victims of the indicted conduct.  <u>See Kaplan</u> v. <u>S.A.C. Capital Advisors, L.P.</u>, 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015); <u>Krear</u> v. <u>Malek</u>, 961 F. Supp. 1065, 1076-78 (E.D. Mich. 1997).  Lerner was not one of the victims in Flynn's schemes.  <u>See</u> Flynn Indictment ¶¶ 6-14, 17-23.  Thus, all of the alleged predicate acts related to the Solar Resources claim survive because Colman has not argued that those are actionable as securities fraud, but Lerner cannot use the four Flynn-led schemes as predicate acts.

### 2.    Count I: Violation of 18 U.S.C. section 1962(c)

What remains after applying the PSLRA exception are the claims related to the Solar Resources scheme.  <u>See</u> Compl. ¶¶ 153-161.  For purposes of analyzing the four elements of 1962(c), this Court will look only to the Solar Resources scheme for the "conduct" and "racketeering" elements, but will consider the facts alleged with respect to the Flynn-led scheme in determining if an "enterprise" exists.  This is because the

[34]

PSLRA exception refers to any "conduct" actionable as fraud, a term of art in the RICO landscape referring to one of the four elements of a claim.  18 U.S.C. § 1964(c); Sedima, 473 U.S. at 496.  The "racketeering" element derives from the "conduct" element.  See id. at 495 (explaining that "'racketeering activity' consists of no more and no less than commission of a predicate act"); id. at 496 (holding that "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern"); see also MLSMK, 651 F.3d at 278-79 ("Congress 'intend[ed]' that the section 'would eliminate securities fraud as a predicate offense in a civil RICO action . . . .'" (quoting H.R. Rep. 104-369, at 47) (alteration in original but emphasis added)).  The existence of an "enterprise," however, is a separate inquiry not based on any particular "conduct."  See United States v. Turkette, 452 U.S. 576, 580 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.").  The pattern element will be discussed below as the question of how it interacts with the PSLRA is complex and warrants separate treatment.

### a.    The Enterprise

Colman argues that Lerner has failed adequately to plead the existence of an association-in-fact enterprise because she

has failed to allege a connection between the Solar Resources scheme and the Flynn-led schemes.  Colman Mem. 8-9.  Since he did not manage DJFCO or any other entity Lerner accuses of wrongdoing, Colman reasons that this Court cannot consider him part of the alleged enterprise.  Id. at 9 (citing Brennan v. Ferriera, 251 F. Supp. 3d 338, 342 (D. Mass. 2017)).  Canavan similarly argues that the facts alleged in the complaint do not adequately allege criminal conduct, let alone conduct as part of an enterprise.  Canavan Mem. 3-5.  Lerner argues that these defendants, two attorneys, need not hold a formal managerial position in the enterprise to be considered participants if they are involved in its operation.  Pl.'s Opp'n Colman 10 (citing Reves, 507 U.S. at 179).  Here, a liberal reading of Colman's complaint indicates that she has sufficiently pled the association-in-fact elements of a RICO enterprise.

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); Turkette, 452 U.S. at 583.  An association-in-fact enterprise requires three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009).  In order "'to conduct or participate,

[36]

directly or indirectly, in the conduct of such enterprise's
affairs' one must participate in the operation or management of
the enterprise itself." <u>Reves</u>, 507 U.S. at 185 (quoting 18
U.S.C. § 1962(c)); <u>cf.</u> <u>United States</u> v. <u>Marino</u>, 277 F.3d 11, 34
(1st Cir. 2002) ("The RICO net is woven tightly to trap even the
smallest fish, those peripherally involved with the enterprise."
(quoting <u>United States</u> v. <u>Elliott</u>, 571 F.2d 880, 903 (5th Cir.
1978))).  The plaintiff must provide "evidence of an ongoing
organization, formal or informal, and . . . evidence that the
various associates function as a continuing unit." <u>Turkette</u>,
452 U.S. at 583.

Lerner alleges that Colman, Canavan, and Flynn formed the
association-in-fact enterprise around 1999 for the purpose of
"inducing investors to loan money to the enterprise under false
pretenses and knowing the investors would not receive a return
on their investments in order to obtain money not rightfully
belonging to the enterprise." Compl. ¶¶ 155-157.  She also
claims that the enterprise existed "to illegally take control
over Solar Resources, illegally increase the value of Solar
Resources, and then sell it at a profit." <u>Id.</u>  She claims that
the three men have known each other since high school, <u>id.</u> ¶ 35,
and that for a period of at least six years, both Canavan and
DJFCO, which employed Colman as general counsel, did business at
1495 Hancock Street in Quincy. <u>Id.</u> ¶¶ 38-41.  While it is not

plausible that the three men came together in 1999 to effect the latter half of this twofold common purpose -- the Solar Resources scheme -- Lerner sufficiently alleges they had a common purpose to defraud investors in other schemes, and that their enterprise was involved in Solar Resources.

Regarding the continuity and distinctness requirements, Boyle held that an enterprise requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946; see also United States v. Rodríguez-Torres, 939 F.3d 16, 24 (1st Cir. 2019) ("[T]here must also be evidence of 'interpersonal relationships' calculated to effect that purpose, i.e., evidence that the group members came together to advance 'a certain object' or 'engag[e] in a course of conduct.'") (alteration in original) (quoting Boyle, 556 U.S. at 946). Here, Lerner alleges that all three men participated in the Greenleaf Property, East Howard Street Property, and DJF Fund schemes, Compl. ¶¶ 58-86, and alleges Flynn and Colman's involvement in the Patriot Investments scheme. Id. ¶¶ 87-94. With respect to the Solar Resources scheme, Flynn and Canavan are named as recipients of the allegedly fraudulent stock transfers. Id. ¶¶ 95-104, 107, 109-110.[6] The use of DJFCO as

---

[6] Regarding each member's respective role in the alleged enterprise, Lerner alleges:

the hub for these schemes imposes an ascertainable structure on the actions of the three men, as it represents an enterprise distinct from the racketeering activity.   See <u>Handeen</u> v. <u>Lemaire</u>, 112 F.3d 1339, 1352 (8th Cir. 1997).[7]   In light of Flynn's indictment coupled with the allegations that Flynn, Canavan, and Colman worked in concert in the past, and the fact that Flynn and Canavan are beneficiaries of the stock transfer, it is plausible that the three men formed a continuing unit.

The inquiry into whether Colman, Canavan, and Flynn played a part in the operation or management of the enterprise is narrower.   Section 1962(c) imposes liability only upon individuals who conduct or participate in the enterprise's affairs "through" a pattern of racketeering activity.   18 U.S.C. § 1962(c).   Thus, the operation and management test from <u>Reves</u>, 507 U.S. at 185, is limited to an analysis of those actions that

---

"[E]ach of the defendants participated in the conduct of the criminal Enterprise: Colman drafted fraudulent legal documents and caused them to be sent by email and mail to investors, Flynn induced investors to loan the enterprise money through fraud, misrepresentation, and deceit as to how the funds would be used and the strength of the investments, and Canavan contributed legal real estate work and purchased property that was central to the schemes to defraud."

Compl. ¶ 172.
[7] Of course the Solar Resources scheme has no direct connection to DJFCO, but the overlap in personnel involved in the schemes allows the plausible inference that the continuing enterprise from the Flynn-led schemes existed there, as well.

[39]

can be considered part of the pattern of racketeering activity. In this case that category encompasses only the Solar Resources scheme.  As alleged in Lerner's complaint, Colman was the ringleader of this portion of the scheme.  <u>See</u> Compl. ¶ 160. The role of Colman and Flynn, as alleged, appears to be the entirely passive reception of fraudulently acquired stock and promissory notes.  <u>See</u> <u>id.</u> ¶¶ 109-110, 120-122, 136-137, 144-145, 160a-b (mentioning Flynn's and Canavan's alleged involvement without making any accusation that they took an active role), <u>id.</u> ¶¶ 124-127, 130, 160 (accusing Colman alone of causing the allegedly fraudulent transfers).  Without some allegation that the two men aided Colman in executing the scheme, this connection does not impose RICO liability.  Flynn and Canavan had significantly less involvement than the outside accounting firm in <u>Brennan</u>, which this Court did not consider subject to enterprise liability, despite handling a RICO enterprise's books and making false entries, since the firm did not make decisions.  251 F. Supp. 3d at 342.

Therefore, while Lerner has properly alleged the existence of an enterprise, the narrowing of available predicate acts under the PSLRA means that she can bring RICO claims only against Colman.

### b.    Pattern of Criminal Activity

[40]

Lerner alleges that Colman's various actions in advancing the Solar Resources scheme constituted multiple discrete predicate acts, and can themselves form a pattern of racketeering activity.  Compl. ¶¶ 159-160.[8]

To show that Colman engaged in a pattern of racketeering activity, Lerner must allege the commission of two or more predicate acts.  18 U.S.C. § 1961(5); H.J. Inc. 492 U.S. at 238; United States v. Cianci, 378 F.3d 71, 88 (1st Cir. 2004). "[W]hile two predicate acts are necessary to form a RICO 'pattern,' they may not be sufficient unless they are both 'related' and 'amount to or pose a threat of continued criminal activity.'"  Schultz v. Rhode Island Hosp. Tr. Nat'l Bank, N.A., 94 F.3d 721, 731 (1st Cir. 1996) (quoting H.J. Inc., 492 U.S. at 239); see also Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 723 (1st Cir. 1992) (discussing the elusiveness of a working definition of a RICO "pattern").  To satisfy the relatedness requirement, the plaintiff must show that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise

---

[8] In her Opposition Lerner refers to the Solar Resources scheme as a single predicate act, along with each of the four Flynn-led schemes.  Colman Opp'n 13 ("[T]he Complaint alleges five separate predicate acts . . .").  This Court considers the use of the term "predicate act" in her Opposition merely to reflect the different focus of her argument, rather than an attempt to back-track on the complaint's allegation that the scheme itself was made of multiple predicate acts.

[41]

are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)).  To show a threat of continuing criminal activity, the plaintiff need not cite separate criminal "schemes" but must show that either the predicate acts together formed a continuous racket ("closed" continuity) or that they threaten future criminal acts ("open-ended" continuity).  Id. at 240-41.

Lerner alleges four viable types of predicate acts within the Solar Resources scheme.[9]  Separate from the primary scheme, she alleges that on January 7, 2008 Colman transferred 2,500 shares of stock to Flynn without authorization in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).  Compl. ¶ 160a.[10] The second set of predicate acts is Colman's transfer of shares to himself, Flynn, Canavan, and the Colman family members in violation of the same provisions.  Id. ¶¶ 107, 160c-d.  The

---

[9] Lerner does not explicitly number these actions, but whether this Court counts up each instance of separate mailings or views them collectively does not change the analysis.  See Menzies, 197 F. Supp. 3d at 1100 ("[T]he sheer number of mail or wire fraud acts alone does not, by itself, establish the requisite threat of continued criminal activity.").

[10] Her second allegation, that Colman issued promissory notes to Canavan without Bill Colman's authorization, does not qualify as a RICO predicate act because as pled it constitutes only a potential violation of fiduciary duty, which is not actionable under RICO.  See Compl. ¶ 160b; La Vay Corp. v. Dominion Fed. Sav. & Loan Ass'n, 830 F.2d 522, 529 (4th Cir. 1987).

third act is the mailing of the falsified water right assignment
to the Utah Division of Water Rights in violation of the mail
and wire fraud acts, and the fourth is the procurement of
Lerner's consent to the sale of Solar Resources through
fraudulent interstate communication.  Id. ¶¶ 160e-h.  These
predicate acts have the same victim -- Bill Colman or his estate
-- the same purpose of extracting value from Solar Resources,
and the same method of utilizing fraudulent or forged documents,
id. ¶¶ 126-127, 160, and therefore easily pass the relatedness
test.  H.J. Inc., 492 U.S. at 240.

### i. Closed Continuity

Colman argues that all of his alleged actions surrounding
the Solar Resources scheme are "related to a unitary goal" and
therefore cannot form a RICO pattern.  Colman Mem. 10.  Colman
is correct for the purpose of examining closed continuity.

The Supreme Court has "described continuity as 'both a
closed- and open-ended concept, referring either to a closed
period of repeated conduct, or to past conduct that by its
nature projects into the future with a threat of repetition.'"
Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 16 (1st Cir.
2000) (quoting H.J. Inc., 492 U.S. at 241).  A small number of
predicate acts committed over a "few weeks or months" do not
establish closed continuity, id. (quoting H.J. Inc., 492 U.S. at
242), but where the acts are so far-reaching and extend over

[43]

such a long time period that "common sense compels a conclusion of continuity," then closed continuity exists, Giuliano v. Fulton, 399 F.3d 381, 387 (1st Cir. 2005) (quoting Efron, 223 F.3d at 17).  When the time period lies somewhere in the middle a court should look to other indicia, including whether the acts amount to a single scheme, whether the scheme had multiple victims, and whether it had the potential to last indefinitely or was essentially finite.  Home Orthopedics Corp. v. Rodríguez, 781 F.3d 521, 529 (1st Cir. 2015).  The First Circuit has explained that "RICO is not aimed at a single narrow criminal episode, even if that single episode involves behavior that amounts to several crimes."  Systems Mgmt., Inc. v. Loiselle, 303 F.3d 100, 105 (1st Cir. 2002) (internal citations omitted).

Here, all of the alleged acts occurred over a period of four and one-half years (January 2008 to August 2012).  Compl. ¶ 160.  This is not so long a period of time so as to automatically qualify as "continuous."  Cf. Fleet Credit Corp. v. Sion, 893 F.2d 441, 447 (1st Cir. 1990) (holding that 95 fraudulent mailings over a four and one-half year period constituted closed continuity, but that if the number of predicate acts had been "few" there would be no continuity).  Except for one disconnected act in 2008, all of the conduct was committed over a short period of time, making the 2008 transaction a "sporadic" offshoot that does not weigh heavily in

[44]

the temporal analysis.  Id. (quoting H.J. Inc., 492 U.S. at 239).

The other indicia show that the Solar Resources scheme did not exhibit closed continuity.  The ur-example of a single scheme that would qualify comes from H.J. Inc., where the Supreme Court ruled that Northwestern Bell's alleged six-year campaign of bribery targeted at five Minnesota government officials, designed to secure favorable rates, exhibited closed continuity despite being a single "scheme."  492 U.S. at 250. The First Circuit has been reluctant to find closed continuity in single schemes of a more limited nature, however.  In Efron, the court ruled that a scheme consisting of numerous alleged instances of wire and mail fraud, all designed to drive up costs in the construction of a hotel in order to extract value, did not exhibit closed continuity because the scheme was limited to a single business venture.  223 F.3d at 19.  Similarly, in Giuliano the court ruled that a series of fraudulent mailings designed to gain control of a racetrack business venture were insufficient to establish closed continuity, as the fraud was limited to a single business with only one victim.  399 F.3d at 390 ("Our case law suggests that the commission of 16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity.").  Accord Home Orthopedics, 781 F.3d at 530; Systems Mgmt., 303 F.3d at 105-06.

[45]

The Solar Resources scheme -- viewed on its own -- targeted only a single business, had a very limited set of victims (Bill Colman and his estate), and had a finite end date.  It therefore does not exhibit the kind of closed continuity indicating a RICO pattern.

### b. Open-ended Continuity

Lerner argues that the Solar Resources forms a pattern with the Flynn-led schemes because, in all of them, the enterprise members diverted funds and assets in order to enrich themselves through the use of fraudulent or forged promissory notes and investment documents.  Pl.'s Opp'n Colman 14.  Though she argues that the five schemes together exhibit closed continuity, her allegations also suggest open-ended continuity by illustrating the enterprise's regular way of doing business.  H.J. Inc., 492 U.S. at 242.  This is true only when taking into account the four Flynn-led schemes, however, and the PSLRA exception bars this Court from considering them for the open-ended continuity analysis.

A plaintiff may demonstrate a "pattern" by showing a "threat" of future criminal activity, defined as "a realistic prospect of continuity over an open-ended period yet to come." Home Orthopedics 781 F.3d at 531 (quoting Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 45 (1st Cir. 1991)).  "This approach necessitates a showing that the racketeering acts

[46]

themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Feinstein, 942 F.2d at 45 (alteration and omission in original) (citation and internal quotation marks omitted). "The 'open-ended' approach . . . allows a plaintiff to state a claim without waiting for a long-term pattern to develop 'so long as the alleged racketeering acts themselves include a specific threat of repetition extending indefinitely into the future or are part of an ongoing entity's regular way of doing business.'" Rojas-Buscaglia v. Taburno-Vasarely, 39 F. Supp. 3d 208, 214 (D.P.R. 2014) (quoting Giuliano, 399 F.3d at 387).

Here, Lerner has alleged that Colman conducted the Solar Resources scheme through the use of fraudulent documents and forgeries, just as the enterprise allegedly conducted itself through the regular provision of falsified promissory notes and documents. See Compl. ¶¶ 160, 169, 171; Bolivar v. Fit Int'l Group Corp., No. 12cv781 (PGG) (DF), 2017 U.S. Dist. LEXIS 39887, at *56 (S.D.N.Y. Mar. 16, 2017). Flynn's subsequent arrest and conviction do not interrupt the open-ended continuity analysis, as this analysis examines events as they existed at the time of the predicate acts. Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 410 (6th Cir. 2012).

The PSLRA, however, presents a roadblock to establishing

[47]

open-ended continuity.  The text of section 1964(c) states that
a plaintiff may not rely on "any conduct that would have been
actionable as fraud in the purchase or sale of securities to
establish a violation of section 1962."  18 U.S.C. § 1964(c).
Allowing Lerner to cite Colman's alleged involvement in the
Flynn-led schemes to establish open-ended continuity would allow
her to use "conduct" barred by the PSLRA to "establish a
violation of section 1962."  As a general rule, a court may look
beyond predicate acts to the totality of the circumstances in
establishing open-ended continuity, <u>see</u> <u>Heinrich</u>, 668 F.3d at
410; <u>United States</u> v. <u>Kaplan</u>, 886 F.2d 536, 542 (2d Cir. 1989),
but the plain language of the PSLRA creates an exception to the
rule.  This interpretation comports with the case law.  For
example, the Second Circuit in <u>MLSMK</u> stated that the PSLRA
exception was designed "to prevent litigants from using artful
pleading to boot-strap securities fraud cases into RICO cases,
with their threat of treble damages."  651 F.3d at 274 (citation
omitted).  Similarly, the district court in <u>Krear</u>, interpreting
the PSLRA's "conviction exception," narrowed its application
only to the victims of indicted conduct in part because allowing
parties other than the victims to sue "would necessarily cause
the 'conviction exception' to swallow the rule which prohibits
civil RICO claims for securities fraud."  961 F. Supp. at 1076.
Here, allowing Lerner to cite the conduct from the Flynn-led

[48]

schemes would let her "boot-strap" a limited and discrete case of fraud into a RICO claim, using securities fraud as the strap. This conflicts with the accepted broad interpretation of the PSLRA.

Without the Flynn-led schemes, the Solar Resources scheme does not exhibit open-ended continuity.  Accordingly, this Court must dismiss count I against Colman.

### 3.    Count III: Violation of 18 U.S.C. section 1962(d)

Lerner argues that, even if counts I and II are not viable, she still has a valid claim for RICO conspiracy under section 1962(d) because the existence of a conspiracy can be inferred by the conduct of the enterprise.  Pl.'s Opp'n Colman 17-18. Colman argues the opposite, that Lerner's failure to plead a viable cause of action renders her conspiracy claim null. Colman Mem. 12.

Colman is correct.  A plaintiff can bring a section 1964(d) conspiracy claim only if she has been injured by racketeering activity, so proof of conspiracy naturally requires the existence of a viable racketeering injury.   Beck, 529 U.S. at 507.  Section 1964(d) is not redundant due to other RICO provisions because "the conspiracy provision allows persons who are responsible for an injury, but did not actually participate in the injury-causing activity, to be held liable."  Beck v. Prupis, 162 F.3d 1090, 1099 (11th Cir. 1998).  Here, as Lerner

[49]

does not have a viable racketeering claim, she also cannot bring a conspiracy claim.

**4.  State Law Claims**

The remaining state law claims do not give rise to federal question jurisdiction.  28 U.S.C. § 1331.  The Court declines to exercise supplemental jurisdiction over these claims.  <u>See</u> 28 U.S.C. § 1367(c); <u>Carlsbad Tech., Inc.</u> v. <u>HIF Bio, Inc.</u>, 556 U.S. 635, 639-40 (2009); <u>Lambert</u> v. <u>Fiorentini</u>, 949 F.3d 22, 29 (1st Cir. 2020). Accordingly, these claims are dismissed without prejudice to their refiling in the appropriate state court.

**III. CONCLUSION**

The Defendants' motions to dismiss as to counts I-III is GRANTED, and Lerner's RICO claims are dismissed with prejudice. The Defendants' motion to dismiss counts IV-VI is also GRANTED, and these claims are dismissed without prejudice.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE

[50]

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Sandra Colman Lerner
**Plaintiff**

                                                                  CIVIL ACTION

V.                                                               NO. 19cv11738-WGY

Stephen J. Colman et al
**Defendant**

## ORDER OF DISMISSAL

**YOUNG DJ**,

        In accordance with the Court's MEMORANDUM AND ORDER entered on September 4, 2020, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

                                                    By the Court,

                                                    /s/Matthew A. Paine

                                                    Deputy Clerk

September 8, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SANDRA COLMAN LERNER,<br><br>     Plaintiff,<br>v.<br><br>STEPHEN J. COLMAN,<br><br>     Defendant,<br>v.<br><br>DANIEL J. FLYNN III, and JAMES CANAVAN,<br><br>     Enterprise Defendants,<br>v.<br><br>LISA LaBRIQUE, ELIZABETH COLMAN, KAREN REIDY, KIRSTEN HUNT, and WILLIAM CHRISTOPHER COLMAN,<br><br>     Defendants. | C.A. No. 1:19-cv-11738-WGY |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given pursuant to Fed. R. App. P. 3(a)(1) that the Plaintiff, Sandra Colman Lerner, appeals to the United States Court of Appeals for the First Circuit from the Order of Dismissal entered against her in the above matter on September 8, 2020, but only to the extent that Order dismisses Counts I-III.

1

Respectfully submitted,
SANDRA COLMAN LERNER
By her attorneys,


/s/ Michael F. Connolly
Michael F. Connolly, BBO #551273
William D. Black, BBO #703229
Rubin and Rudman LLP
53 State Street, 15th Floor
Boston, MA 02109
Tel: 617 330-7000
Fax: 617 330-7550
mconnolly@rubinrudman.com
wblack@rubinrudman.com

Dated:  October 7, 2020


## CERTIFICATE OF SERVICE

I, Michael F. Connolly, hereby certify that a true and correct copy of this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 7, 2020.


/s/ Michael F. Connolly
Michael F. Connolly

2476433_1